AMMON & PERSON v. NARRAGANSETT DAIRY CO., Limited.

NARRAGANSETT DAIRY CO., Limited, v. AMMON & PERSON.

(Circuit Court of Appeals, First Circuit. November 18, 1919.)

Nos. 1404, 1405.

1. TRADE-MARKS AND TRADE-NAMES ⊚⟿31—EXTENT OF RIGHTS ACQUIRED.
   The adoption of a trade-mark does not, at common law, project the right of protection in advance of the extension of the trade, or operate as a claim of territorial rights over areas into which it may thereafter be deemed desirable to extend the trade.

2. TRADE-MARKS AND TRADE-NAMES ⊚⟿31—USERS IN DIFFERENT TERRITORY EACH ENTITLED TO PROTECTION.
   Where two users of the same or a similar trade-mark occupy essentially different territory, each is entitled to its exclusive use in its own territory as against the other, regardless of which was the earlier user.

3. TRADE-MARKS AND TRADE-NAMES ⊚⟿35—SALE OF TANGIBLE PROPERTY DOES NOT CARRY TRADE-MARK.
   Sale by a collector of the plant, product, and material of an oleomargarine manufacturer, forfeited under Act Aug. 2, 1886, § 17 (Comp. St. § 6229), does not carry the business, good will, or trade-mark.

4. TRADE-MARKS AND TRADE-NAMES ⊚⟿38 — ABANDONMENT; ADOPTION BY ANOTHER.
   That one of two users of the same trade-mark had the right to its use in its own territory does not entitle a third party, on the abandonment of its business by such user, to adopt its trade-mark as against the other user, which is extending its trade into such territory.

5. TRADE-MARKS AND TRADE-NAMES ⊚⟿98 — INFRINGEMENT; RECOVERY OF PROFITS.
   To entitle the owner of a trade-mark to recover profits from an infringer, it has the burden to prove that defendant has made profits attributable in whole or in part to its use of the trade-mark.

Appeals from the District Court of the United States for the District of Rhode Island; Arthur L. Brown, Judge.

Suit in equity by Ammon & Person, a corporation, against the Narragansett Dairy Company, Limited. From the decree, both parties appeal. Affirmed.

For opinions below, see 252 Fed. 276; 254 Fed. 208.

George J. Hesselman, of New York City (Eliot G. Parkhurst and Edwards & Angell, all of Providence, R. I., and Pennie, Davis, Marvin & Edmonds, of New York City, on the brief), for Ammon & Person.

Alexander Churchill, of Providence, R. I. (Wilson, Churchill & Curtis, of Providence, R. I., on the brief), for Narragansett Dairy Co., Limited.

Before BINGHAM, JOHNSON, and ANDERSON, Circuit Judges.

ANDERSON, Circuit Judge. This is a trade-mark infringement case. The plaintiff is a wholesale dealer in oleomargarine, organized as a corporation under the laws of New Jersey, with headquarters at Jersey City. It and its predecessors in title have used since 1891 the trade-mark "Queen of the West" on oleomargarine sold by them. In

---

this name the word "Queen" is obviously the dominant part, as the court below held.

[1] The defendant is a Rhode Island corporation, organized in August, 1915. It manufactures and sells oleomargarine at Providence, R. I. The Narragansett Dairy Company (not the defendant) applied the trade-name "Queen" to oleomargarine manufactured and sold by it at Providence during the period 1909 to August, 1915. On August 31, 1915, the oleomargarine and other tangible assets of the old Narragansett Company were seized by the collector of internal revenue, under a warrant of distraint for nonpayment of taxes, and sold. This property was bought in by one Matthews, and transferred on the same date to the defendant company, which at once began and has continued the manufacture of oleomargarine at the same place, selling it under the trade-mark "Queen." While the plaintiff has registered "Queen" as its trade-mark, we agree with the court below that the case must be determined on common-law principles, and that no rights now in question have been acquired out of registration.

The earlier Narragansett Company adopted the use of the word "Queen" in good faith and with no intent to infringe upon any rights of the plaintiff. Both the plaintiff and the old company sold their goods as their own to their own customers. There is no evidence of any confusion of goods or of any unfair competition.

It thus appears that up to September, 1915, two concerns were carrying on the same general line of business, partly in the same territory, each operating under trade-marks likely at some time to confuse the purchasing public, but each in fact reaching its own customers, and without any real confusion in the trade.

The District Court held that "the plaintiff's right to an injunction is not free from doubt, but seems justified in order to prevent confusion likely to arise in the natural expansion of trade. * * * The plaintiff's equity rests upon its showing a prior use of the trade-mark 'Queen of the West' and of the trade-name 'Queen.'"

The court below also held that it was "unnecessary to determine whether the defendant has succeeded to the rights, if any, of the earlier Narragansett Company." An injunction was granted, but the plaintiff's prayer for an accounting for profits and damages was denied. Both parties appealed.

The decision of the District Court was made on December 12, 1918. On December 9, 1918, the Supreme Court had decided the case of United Drug Co. v. Rectanus Co., 248 U. S. 90, 39 Sup. Ct. 48, 63 L. Ed. 141, with a most illuminating opinion by Mr. Justice Pitney. This case was not cited by the District Court, and would not, in the natural course of events, be in print or otherwise available for its guidance.

The legally significant facts in the Rectanus Case are, we think, substantially on all fours with the case at bar. In that case, it appeared that as early as 1877 Mrs. Regis, at Haverhill, Mass., had adopted the word "Rex" as a trade-mark for certain medicines prepared by her. These medicines were thereafter sold by her and her successor in title, the United Drug Company, under this trade-mark in Massachusetts

and neighboring states. In 1883, Rectanus, a druggist of Louisville, Ky., applied the same name "Rex" to certain medicines prepared and sold by him in Louisville, and later in other parts of Kentucky. In the course of the expansion of the trade of the United Drug Company, the two concerns, using the same trade-name for competing products, came into collision in Kentucky. The plaintiff claimed an exclusive right on the ground of prior use. The District Court sustained the plaintiff's contention. 206 Fed. 570. The Court of Appeals reversed the District Court and ordered the bill dismisesd. 226 Fed. 545, 141 C. C. A. 301. The decree of the appellate court was affirmed by the Supreme Court. The principles held controlling in that case are thus stated, 248 U. S. 96, 39 Sup. Ct. 50, 63 L. Ed. 141:

"The entire argument for the petitioner is summed up in the contention that whenever the first user of a trade-mark has been reasonably diligent in extending the territory of his trade, and as a result of such extension has in good faith come into competition with a later user of the same mark, who in equal good faith has extended his trade locally before invasion of his field by the first user, so that finally it comes to pass that the rival traders are offering competitive merchandise in a common market under the same trade-mark, the later user should be enjoined at the suit of the prior adopter, even though the latter be the last to enter the competitive field and the former have already established a trade there. * * *

"The asserted doctrine is based upon the fundamental error of supposing that a trade-mark right is a right in gross or at large, like a statutory copyright or a patent for an invention, to either of which, in truth, it has little or no analogy. Canal Co. v. Clark, 13 Wall. 311, 322 [20 L. Ed. 581]; McLean v. Fleming, 96 U. S. 245, 254 [24 L. Ed. 828]. There is no such thing as property in a trade-mark except as a right appurtenant to an established business or trade in connection with which the mark is employed. The law of trade-marks is but a part of the broader law of unfair competition; the right to a particular mark grows out of its use, not its mere adoption; its function is simply to designate the goods as the product of a particular trader and to protect his good will against the sale of another's product as his; and it is not the subject of property except in connection with an existing business. Hanover Milling Co. v. Metcalf, 240 U. S. 403, 412–414 [36 Sup. Ct. 357, 60 L. Ed. 713].

"The owner of a trade-mark may not, like the proprietor of a patented invention, make a negative and merely prohibitive use of it as a monopoly. See United States v. Bell Telephone Co., 167 U. S. 224, 250 [17 Sup. Ct. 809, 42 L. Ed. 144]; Bement v. National Harrow Co., 186 U. S. 70, 90 [22 Sup. Ct. 747, 46 L. Ed. 1058]; Paper Bag Patent Case, 210 U. S. 405, 424 [28 Sup. Ct. 748, 52 L. Ed. 1122].

"In truth, a trade-mark confers no monopoly whatever in a proper sense, but is merely a convenient means for facilitating the protection of one's good will in trade by placing a distinguishing mark or symbol—a commercial signature—upon the merchandise or the package in which it is sold.

"It results that the adoption of a trade-mark does not, at least in the absence of some valid legislation enacted for the purpose, project the right of protection in advance of the extension of the trade, or operate as a claim of territorial rights over areas into which it thereafter may be deemed desirable to extend the trade."

[2] We think these principles are applicable and must control the respective rights of the plaintiff and of the earlier Narragansett Dairy Company. While it is true that both these concerns were operating to some degree in the same territory, and that their markets were not, in the territorial sense, "remote," yet on this record we must find that neither concern had to any substantial degree invaded the other

concern's commercial or market territory. As already pointed out, the markets—the customers—of the two concerns were essentially separate. The plaintiff had not occupied the oleomargarine market in the territory in which the earlier Narragansett Dairy Company was, in good faith and without knowledge of the plaintiff's trade-mark, manufacturing and selling its product under the trade-name "Queen." It follows, we think, that if the case at bar were to be determined on the basis of the status obtaining between the plaintiff and the earlier Narragansett Dairy Company, the bill would have to be dismissed. In other words, in order to prevail, the plaintiff must now show that it has greater rights against this defendant than it had against the earlier Narragansett Company. It was not entitled, we think, to prevent the earlier company from continuing the use of the name "Queen" in its own commercial territory.

[3] This conclusion makes it necessary to consider and determine what the court below held it unnecessary to determine, to wit: "Whether the defendant has succeeded to the rights, if any, of the earlier Narragansett Company." If the defendant has so succeeded, we think, under the Rectanus Case, supra, the bill should be dismissed. But on consideration of the record we think it clear that the defendant has not succeeded to the rights of the earlier Narragansett Company to use the trade-mark "Queen"; and, so holding, we reach the same result reached by the court below. The salient facts bearing on this point may be briefly outlined.

The statute under which the collector of internal revenue proceeded against the defendant contains no mention of trade-marks, good will, going concern value, or any other sort of intangible property. It provides that the delinquent taxpayer "shall forfeit the factory and manufacturing apparatus used by him, and all oleomargarine and all raw material for the production of oleomargarine found in the factory and on the factory premises, and shall be fined," etc. Act Aug. 2, 1886, c. 840, § 17, 24 Stat. 212 (Comp. St. § 6229). As this is a penal statute, it cannot be extended by construction. No attempt was made by the collector to sell any trade-mark, good will, or other intangible assets. The schedule of property sold by the collector to Matthews and transferred by Matthews to the new corporation contains no mention of trade-mark, good will, or other intangible property. The old corporation has not been dissolved. It is, so far as this record shows, still legally alive. The sale of its tangible property simply killed its business; and it abandoned thereafter all attempts to preserve its good will, including any right in its trade-marks previously used. The case is in these respects like the Jaysee Corset Co. Case (D. C.) 201 Fed. 779, where, subsequent to the sale of the chattels of a bankrupt, the trustee in bankruptcy attempted to sell the good will and trade-marks of the bankrupt's former business. Judge Hough said:

"In due course of time the trustee sold the goods and chattels of the bankrupt, but made no attempt to sell the good will of the bankrupt's business, nor the trade-mark; nor did he sell the business as a going concern. The effect of these proceedings by the trustee was to kill the good will and destroy the

trade-mark; for it is admitted that this particular kind of trade-mark cannot pass, except in conjunction with the good will of a business. What has become of the bankrupt's business? It stopped by bankruptcy, was killed by the trustee's sale, and the present intended action on the part of the trustee is an attempt to galvanize it into life again, something which cannot be done."

This pungent statement is really nothing but an assertion of the same doctrine laid down by Mr. Justice Pitney in United Drug Co. v. Rectanus, 248 U. S. 97, 39 Sup. Ct. 50, 63 L. Ed. 141:

"There is no such thing as property in a trade-mark, except as a right appurtenant to an established business or trade in connection with which the mark is employed."

Where the business goes, the trade-mark goes, whether in life or to death.

[4] Indeed, defendant's counsel make no serious attempt to show that the defendant is the legal successor of the earlier Narragansett Dairy Company, or that it in any way derived any legal title to the trade-mark "Queen" by reason of its purchase of the earlier company's tangible assets and assumption of the contracts outstanding at the time of the sale by the collector of internal revenue. Counsel base their claim rather on the ground that the plaintiff's failure to enforce as against the earlier company an exclusive right to this trade-mark permitted the defendant or any other newcomer to use the infringing name. This is not the sound view. The plaintiff, as the original adopter of the trade-mark "Queen," or in which "Queen" was the dominant word, would have been entitled to enjoin any other later infringing user of that word, had it not been for the equal equity accruing to the earlier Narragansett Company out of its adoption, in good faith, of essentially the same name, and continued use thereof in a market essentially separate from that of the plaintiff. The failure of the plaintiff prior to 1909 to occupy exclusively the field subsequently occupied in part by the earlier Narragansett Company did not, when that earlier company abandoned its business, open the door to the defendant or to any other volunteer to use the plaintiff's trade-mark, or any colorable imitation thereof, at least in a territory then in part occupied by the plaintiff and a field in which its business was expanding.

We reach, therefore, the same conclusion as to the plaintiff's right to an injunction reached by the court below; but, guided by the decision of the Supreme Court in the Rectanus Case, on different grounds.

[5] So far as damages and profits are concerned, we agree, also, with the District Court that the burden is upon the plaintiff to prove that the defendant has made profits attributable, in whole or in part, to its trade-mark. Westinghouse Mfg. Co. v. Wagner Mfg. Co., 225 U. S. 604, 622, 32 Sup. Ct. 691, 56 L. Ed. 1222, 41 L. R. A. (N. S.) 653; Ludington Novelty Co. v. Leonard, 127 Fed. 155, 62 C. C. A. 269; Keystone Type Foundry v. Portland Pub. Co. (C. C.) 180 Fed. 301. This burden was not sustained.

It is true that the plaintiff promptly notified the defendant in September, 1915, that its use of the word "Queen" was an infringement upon the plaintiff's rights, and that the defendant thereafter wrong-

fully persisted in this infringing use. But, as the court below found, there was no evidence that any mistake was ever made by purchasers, and there was affirmative evidence that no mistake was made to the knowledge of the defendant's officials. Moreover, the goods of the two concerns were to some degree distinguished by cartons, labels, and other markings, notwithstanding the common use of the word "Queen" as a trade-mark. The findings of the court below, that "the evidence fails to show that the defendant has adopted the word 'Queen' with any intention of deceiving the public, or of appropriating the plaintiff's good will or trade reputation," and "that the word 'Queen' was used by the defendant apparently in good faith and in reliance upon its former use by the earlier company which had used it since 1909," were plainly warranted by the evidence and dispose of any doubt otherwise .possibly arising as to the plaintiff's right to an accounting for damages and profits.

The decree of the District Court is affirmed, and neither party recovers costs of appeal.