## GENERAL BAKING CO. v. GORMAN.

(Circuit Court of Appeals, First Circuit. January 27, 1925. Rehearing Denied March 9, 1925.)

No. 1791.

**1. Trade-marks and trade-names and unfair competition ⊂⊃22—Complainant is entitled to no protection in a trade grounded on misrepresentations.**

In 1911 complainant commenced the operation of a bakery in Providence, R. I., for intrastate trade. In 1915 and later it adopted the name "Bond" as a trade-mark for its bread in certain cities in other states, but not in Rhode Island. In 1917 defendant, who served two cities in the state and their vicinity with bread, without knowledge of complainant's use of the word "Bond," adopted the name "Liberty Bond" as a trade-mark for his bread, accompanied on the wrappers with a picture of the Statue of Liberty and his name as maker. In 1921 complainant instituted a bread-making contest among the women at Providence, stating that it would have the prize-winning loaves analyzed and make a bread modeled on them, to be called "Bond Bread," which would be a distinctively Rhode Island product. In fact, the bread which it thereafter made and sold under that name was made in accordance with its old formula used in other states. *Held* that, because of such misrepresentation, it acquired no good will or other rights in the name "Bond," which entitled it to protection by a court of equity; that, if there was infringement as between "Bond" and "Liberty Bond," as trade-marks for bread in Rhode Island, complainant was the infringer.

**2. Trade-marks and trade-names and unfair competition ⊂⊃31—Use of trade-mark for one kind of bread held to give no right in its use for a different kind.**

The use of a trade-mark for bread gives the user no rights in its use for a different kind, made in a different place for the local trade.

**3. Trade-marks and trade-names and unfair competition ⊂⊃53—Cases of infringement and unfair competition are affected with a public interest.**

Unfair competition, of which trade-mark infringement is but a part, is, broadly speaking, grounded on the right of both dealer and purchasing public to be protected from frauds of which both are victims.

**4. Trade-marks and trade-names and unfair competition ⊂⊃45—Registration of trade-mark does not affect right to its use in purely local business.**

Rights in trade-marks are of common-law origin, and are always appurtenant to an established business or trade in connection with which they are employed, and the federal registration of a trade-mark for interstate commerce gives no right to its use in a purely local business, subsequently established, as against a local prior user.

Appeal from the District Court of the United States for the District of Rhode Island; Arthur L. Brown, Judge.

Suit in equity by the General Baking Company against James H. Gorman. Decree for defendant, and complainant appeals. Affirmed.

For opinion below, see 295 F. 168.

Julius M. Mayer, of New York City (F. P. Warfield, E. W. Leavenworth, and Mayer, Warfield & Watson, all of New York City, on the brief), for appellant.

James H. Higgins, of Providence, R. I. (William H. Camfield, Walter V. Moriarty, and Fitzgerald & Higgins, all of Providence, R. I., on the brief), for appellee.

Before JOHNSON and ANDERSON, Circuit Judges, and BREWSTER, District Judge.

ANDERSON, Circuit Judge. Plaintiff sought in the court below (295 F. 169) an injunction and accounting for trade-mark infringement and for unfair competition, on the ground that the defendant's sale of "Liberty Bond" bread in Pawtucket, Central Falls, and vicinity, R. I., infringed the plaintiff's alleged trade-mark "Bond." In this court no contention is pressed of unfair competition or for an accounting. But the plaintiff still asserts itself entitled to an injunction.

[1] Jurisdiction rests on diversity of citizenship. The appellant was organized in 1911, and at that time took over and has since operated a bakery in Providence. In what other cities and states it then had plants does not appear. In its Providence plant it manufactured and sold bread under various names, "Butternut," "Mrs. Walker's," etc., but it did not use in Rhode Island the name "Bond" until 1921.

In 1915, it began to use the name "Bond" in Rochester, N. Y., after an advertising campaign like the one carried on in Providence in 1921, hereinafter described. It registered "Bond" as a trade-mark in the United States Patent Office on April 18, 1916.

After similar advertising campaigns, it began in 1916 to sell "Bond" bread in Buffalo, and in May, 1917, in Philadelphia.

In August, 1917, the defendant, acting, as the court below found, in entire good faith and without any knowledge of the plaintiff's previous use of the word "Bond" in Rochester, Buffalo, and Philadelphia (three cities only), adopted the words "Liberty Bond" for bread manufactured and sold by it in Pawtucket, Central Falls, and vicinity. Defendant's name and the Statue of Liberty appear conspicuously on the wrapper.

After this adoption of the name "Liberty Bond" by the defendant in August, 1917,

plaintiff extended the sale of its bread as "Bond" bread to some 20 cities and expended over $3,000,000 in advertising, apparently all directed to pushing "Bond" bread. But, so far as appears, in each city plaintiff represented its "Bond" bread to be of local genesis (as it did later in Rhode Island), and hence different from the "Bond" bread sold elsewhere.

On January 11, 1921, plaintiff notified defendant that it claimed that his use of the name "Liberty Bond" on bread wrappers was an infringement of its alleged trademark "Bond." This was preliminary to introducing "Bond" bread to Rhode Island.

In March, 1921, plaintiff advertised in the Providence newspapers a prize contest among the women of Rhode Island in making bread. It announced that prizes amounting to $1,000 would be awarded to the 121 women who submitted the best loaves of bread and that—

"The prize-winning loaves will be taken as a model from which the General Baking Company will produce Bond bread. This Bond bread will be offered to the public after the expert bakers analyze the loaves the prize-winners submit, and copy their ingredients and qualities as modern baking science really can. These prize-winning loaves will be taken as ideals, which the General Baking Company will copy and incorporate in a new loaf of bread to be called Bond bread."

Also:

"This will be called Bond bread because it will be guaranteed by the Bond · of the General Baking Company, to possess · the same pure 'home' ingredients, the same homemade taste, the same crust, and the same texture as the best homemade loaves 'which your committee of' well-known Rhode Island women judges will choose. * * *

"We will make bread your way. * * *

"And every day more and more Rhode Island people are adopting this 'child' of those public-spirited women who submitted their homemade loaves."

Thus, and otherwise, plaintiff represented that it would offer on the Rhode Island market a *new* bread, made in accordance with the ascertained, composite, bread-making skill of Rhode Island housewives, and that "Bond" would mean a guaranty by the plaintiff of conformity to the high standard thus learned from Rhode Island housewives.

The scheme thus advertised sharply contrasts with the usual process of introducing, from without, an old, standardized product, alleged to be better than that in current lo-

cal use. But such was the plaintiff's scheme for expanding its business in various cities. Its vice president testifies that these methods were used in at least eight or ten cities.

This advertising was wholly mendacious. The bread made and sold in Providence was not modeled on the composite skill of Rhode Island women breadmakers. It was made in accordance with the' formula that the plaintiff had used, generally, for bread, since 1915. No changes were made in the formula, used in Providence, or in any other cities where like bread-making contests were carried on, in order to conform to a standard derived from bread made by the competing women. The bread these flattered women bought was no "child" of their combined skill. It originated in New York, and was of doubtful parentage.

Plaintiff's chief witness testifies:

"X.Q. 194. Were these advertisements substantially the same in all those eight or ten cities? A. I think so.

"X.Q. 195. And in each one of those eight or ten different cities you gave the people of those cities the distinct impression that in making this Bond bread you were going to depend on the advice and counsel of the contests of the different housewives that these different localities gave you, didn't you? A. Yes, sir.

"X.Q. 196. And at the same time you had your own formula all through the country, and you were following it previous to that, and you have followed it since? A. Yes."

On this state of facts, we are constrained to hold that the plaintiff had no good will or other rights in the name "Bond," as applied to bread sold in Rhode Island, which it can ask a court of equity to protect. The alternatives are these:

[2] If the Rhode Island "Bond" bread had had the genesis that the plaintiff advertised, the plaintiff would have had no rights in a trade-mark, growing out of its previous use of the mark elsewhere, for in Rhode Island "Bond" would have meant a new bread. As the advertising as to the genesis of the Rhode Island Bond bread was false, it gained no rights in Rhode Island as to the future. See Worden v. California Fig Syrup Co., 187 U. S. 516, 23 S. Ct. 161, ·47 L. Ed. 282, and cases cited; particularly Manhattan Medicine Co. v. Wood, 108 U. S. 218, 224, 2 S. Ct. 436, 27 L. Ed. 706. In this case, plaintiff was held disentitled to any relief because dishonestly advertising that its medicine was manufactured by Moses Atwood, of Georgetown, Mass., when in fact it was manufactured by the Manhattan

Medicine Company, of New York City. A fortiori, in the case at bar, the plaintiff is entitled to no protection in a trade grounded upon representations that it was making Rhode Island bread in accordance with the composite skill of Rhode Island housewives, when in fact it was palming off the same kind of product that it had used for five or six years in various other places.

[3] It should never be overlooked that trade-mark and unfair competition cases are affected with a public interest. A dealer's good will is protected, not merely for his profit, but in order that the purchasing public may not be enticed into buying A.'s product when it wants B.'s product. In meritorious cases of this kind, the plaintiff is acting, not only in his own interest, but in the public interest. The situation is radically different from that which arises in cases of alleged infringement of a copyright or a patent, under which the rights originate in a monopoly grant from the government. The existence and extent of such monopolies are therefore, except as they reward and thus promote ingenuity, adverse to the rights of the purchasing or using public. In one aspect, the alleged infringer of a copyright or of a patent is in a fight for the public interest—to make a free and open field. But unfair competition—of which trade-mark infringement is but a part (United Drug Co. v. Rectanus Co., 248 U. S. 90, 97, 39 S. Ct. 48, 63 L. Ed. 141)—is, broadly speaking, grounded on the right of both dealer and purchasing public to be protected from frauds of which both are victims. Dadirrian v. Yacubian, 98 F. 872, 876, 39 C. C. A. 321. In these cases, the infringer works a fraud upon dealer and customer alike; his palming off is piracy pure and simple.

We are therefore driven to the conclusion, apparently reached, although not quite flatly stated, by the court below, that the plaintiff has in Rhode Island no trade-mark right in the word "Bond." What rights, if any, it has elsewhere, is a question not now before us. So far as appears, the plaintiff's Rhode Island trade was entirely intrastate, as was the defendant's. It made and sold bread in Rhode Island. It does not appear to have imported it from outside plants, or to have exported it from the Providence plant. For this, as well as for other fully adequate reasons, it is impossible to attach any significance to its federal registration of its trade-mark for interstate business.

The general result is that if, as between "Bond" and "Liberty Bond," as applied to the sale of bread in Rhode Island, there be any infringement, plaintiff is infringing upon the defendant's rights, not the defendant upon the plaintiff's rights. If the plaintiff's claim "that 'Bond' and 'Liberty Bond' are deceptively similar" is sound, plaintiff is responsible for the deception.

While the court below was "of the opinion that there is not in fact any deceptive similarity between the labels of plaintiff and defendant, and that the possibility of confusion is slight," we think that question should be left open for any further proceedings found necessary, in the light of competitive experience, to protect the defendant and the purchasing public.

Perhaps it is well to add that, if we assume the facts to be substantially as the plaintiff claims them to be, this case falls within the doctrine of the Rectanus Case, supra, and the Hanover Milling Case, 240 U. S. 403, 36 S. Ct. 357, 60 L. Ed. 713, applied by this court in the Narragansett Dairy Case, 262 F. 880. The defendant adopted in good faith, as the court below found, the trade-mark "Liberty Bond" as early as August, 1917. The plaintiff made no attempt to sell bread in Rhode Island as "Bond" bread until March, 1921, ten years after it began operation in Providence. At that time the defendant had a good will in its trade-mark, apparently covering Rhode Island. 240 U. S. 426, 36 S. Ct. 365. Plaintiff was a later comer with its "Bond" bread (assuming for the moment that "Bond" bread and "Liberty Bond" bread would cause any confusion in the use), and could not destroy or encroach upon the defendant's good will in its trade-mark earlier adopted.

We repeat here what we said in the Narragansett Dairy Case, 262 F. 880, 881, referring to the Rectanus Case, supra:

"The legally significant facts are, we think, on all fours with the case at bar."

Besides, the plaintiff had, for three years after defendant had put out Liberty Bond bread, known of the use, and had given no warning of its intention of using "Bond" on its Rhode Island bread; on the contrary, its use of other names for ten years on its Rhode Island output would ground the inference that it had no intention of using "Bond" as a trade-mark in Rhode Island, even if, in 1915, it had used it in New York, and had registered it in 1916 for interstate trade. But its intention, disclosed or undisclosed, was entirely immaterial.

[4] Plaintiff's learned counsel contend that the federal registration of its trade-

mark in 1916 gave it a practically unlimited right of expansion, so that local bakers were thereafter charged with knowledge of its purpose to introduce in their communities "Bond" bread, and were therefore prevented from adopting any trade-name which might conceivably infringe upon the "Bond" trade-mark. This contention, on analysis, falls little short of making federal registration of a trade-mark the equivalent of a patent or a copyright—a far-reaching proposition we cannot adopt. Nothing is better settled than that rights in trade-marks are of common-law origin, and are always "appurtenant to an established business or trade in connection with which" they are employed. See Trade-Mark Cases, 100 U. S. 82, 25 L. Ed. 550; Ainsworth v. Walmsley, L. R. 1 Eq. 518, 524.

Rhode Island cannot be deprived of' the power to protect its citizens in the good will of their business by federal registration of a trade-mark for interstate commerce. Compare the pungent observations of Mr. Justice Holmes in his concurring opinion in the Hanover Milling Case, 240 U. S. 425, 426, 36 S. Ct. 357, 60 L. Ed. 713. The defendant has as much right to expand as has the plaintiff. In Rhode Island its rights to "Liberty Bond" or any similar mark on bread are superior to the plaintiff's rights. Registration for interstate use is not even notice of a purpose "to expand" by building local plants as centers of intrastate trade. Even if it were notice, it would have no effect on a right that "grows out of its use, not its mere adoption." 248 U. S. 97, 39 S. Ct. 48. Compare Waldes v. International Manuf'rs' Agency (D. C.) 237 F. 502, 504.

The result is that, both as matter of law and as matter of fact, plaintiff has no case against this defendant, and the decree below must be affirmed, with costs.

The decree of the District Court is affirmed, with costs to the appellee.