### CLOVERDALE SPRING CO. v. CLOVER CLUB BOTTLING CO., Inc.

Civ. No. 972.

United States District Court
D. Rhode Island.

June 28, 1951.

Joshua Ward and S. Mortimer Ward, Jr. (of Ward, Crosby & Neal), New York City, and Herbert B. Barlow, Providence, R. I., for plaintiff.

Alan P. Cusick, Providence, R. I., for defendant.

HARTIGAN, Circuit Judge.[1]

This is an action for infringement of federally registered trade-marks and for unfair competition. The alleged infringement involves trade-mark No. 302878 for a pictorial representation of a four leaf clover registered May 2, 1933, by the plaintiff and trade-mark No. 120016 for the word "Cloverdale" registered by the plaintiff's predecessors in business January 1, 1918 and renewed by the plaintiff January 1, 1938.

Jurisdiction of this court is alleged to depend on Title 15 U.S.C.A. §§ 1114 to 1118, 1121, and Title 28 U.S.C. § 1338.

The plaintiff, a Maryland corporation, was incorporated February 20, 1922 and has its principal place of business in Baltimore. The defendant, a Rhode Island corporation, was incorporated March 1, 1947 and has its principal place of business in Providence. Both corporations are engaged in the manufacture and sale of non-alcoholic beverages.

Both of the plaintiff's trade-marks have been used continuously by it since the date of its incorporation in February, 1922 to and including the present time and by its predecessors in business for a great many years prior thereto, probably as far back as 1887. They were first used on mineral water and later on non-alcoholic beverages.

The plaintiff markets all of its products under the "Cloverdale" name and four leaf clover mark.

For the period from 1922 to 1948 the plaintiff made expenditures aggregating upwards of $750,000 for advertising; $589,000 for promotional production bearing the trade-marks and its total sales aggregated approximately $13,550,000.

[1.] Designated to hold District Court in District of Rhode Island.

During the years between 1922 and 1948, the plaintiff's shipments covered from 2 to 17 states, including the New England States, and shipments were made in 1927 to Puerto Rico and in 1932 to the Canal Zone.

The plaintiff's peak advertising expenditure was reached in the year 1929 in the amount of $100,000 or more and was in the form of radio, newspaper, magazine, postcard, trade journal, window display advertising, etc. The radio advertising was done over stations in Baltimore, Maryland; Springfield and Boston, Massachusetts; Richmond, Virginia and New York. In 1938 some advertising was done in a nationally distributed magazine called "Hygeia". S. S. Pierce & Company of Boston advertised the plaintiff's products in its catalogue "The Epicure" between 1935 and 1940.

A salesman for the plaintiff covered Massachusetts, Connecticut and Rhode Island territories between the years 1928 and 1933, and in 1929 sold about 5 carloads of plaintiff's products in Rhode Island.

The total aggregate sales of the plaintiff in Rhode Island amounted to about $7,500; in Connecticut $49,500; in Massachusetts $40,200; in Maine $19,800; in New Hampshire $35,400 and in Vermont $21,600.

The plaintiff made its last sales in Maine in 1936; Massachusetts, 1942; Rhode Island, 1933 and Vermont in 1947. The plaintiff made no sales in Rhode Island in 1930 and in 1931 made sales totalling only $274.28. The greatest amount of sales in Rhode Island was in 1929 and totalled about $7,200.

The plaintiff shipped its products from its Newville, Pennsylvania, plant to wholesalers. It has never issued a franchise to a bottler in Rhode Island. It has no record of advertising or promotional sale expenses in Rhode Island. Plaintiff stopped its promotional efforts in New England around 1932 and sales in that area since then were repeat orders which were made without solicitation on the part of the plaintiff.

On April 21, 1931, the president of the plaintiff corporation wrote a letter to the Chairman of the Board of Food and Drug Commissioners of Rhode Island. This let-ter was in response to the Chairman's demand that the plaintiff apply for a bottler's permit to sell its products in Rhode Island. Plaintiff's president stated in part:

"We have not made any sales in the State of Rhode Island since December 1929, * * *

"Should we secure any additional business in your state, we assure you we will have no objection to filling out your application."

On April 5, 1933, the plaintiff wrote another letter to said Chairman and stated:

" * * * we do not ship any goods into Rhode Island, why should we take out a permit?

"We haven't made a shipment to Rhode Island for more than a year and do not have a single customer there so far as we know."

The plaintiff was never registered in Rhode Island as a domestic or foreign corporation.

The plaintiff and its predecessors never advertised in Rhode Island newspapers nor on billboards and never sponsored any radio broadcasts originating in Rhode Island.

On November 15, 1948, an investigator hired by plaintiff's attorney wrote to the defendant a letter in which he stated:

"I am interested in probably opening up several places in Providence and possibly Boston, and dispensing soft drinks, and I would therefore appreciate knowing what beverages you bottle for such use and also some prices and details.

"Also, in order that I may be better acquainted with your product, will you be so kind as to include with your reply a few specimens of your labels."

On November 19, 1948, the defendant sent said investigator samples of its beverages gratis.

On January 6, 1949, the investigator wrote a letter to the defendant acknowledging his thanks for the samples and stated: "The samples which you sent I took with me up to Rhode Island, but I now desire to purchase from you one large sized bottle each of orange soda, grape

soda and if possible ginger ale. Also, one small sized bottle each of orange soda, grape soda and cream soda. Would you please ship these to me here (New York) with a bill, for which I will promptly remit."

On January 17, 1949, the investigator wrote to the defendant acknowledging receipt of the beverages ordered in his letter of January 6th and stated: "And I would now like to have you send me your invoice so that I may remit by check in full."

On January 18, 1949, the defendant wrote the investigator: "I wish to inform you that as the Clover Club beverages we sent to you were samples of our beverages there will be no charge for the same. If this does not meet with your approval will you please inform us as to this effect?"

On January 20, 1949, the investigator wrote to the defendant: "I thank you very much for your letter of January 18th and I would prefer to pay for the samples as I would not like to take them without paying for them."

On January 21, 1949, the investigator wrote to the defendant:

"Please disregard my letter of the 20th instant as I want to buy some other bottles from you.

"In other words, I want you to ship me as soon as possible two cases of assorted flavors, 32 ounce size, and two cases of assorted flavors, 8 ounce size."

On January 21, 1949, the defendant billed the investigator for six bottles of its beverages amounting to sixty-two cents.

On January 22, 1949, the investigator wrote to the defendant:

"Please hold up the shipment referred to in my letter of the 21st instant until further word from me."

In a letter of the investigator, dated January 25, 1949, sent to the plaintiff's attorney, he stated:

"We have obtained a purchase of some bottles from the Clover Club Bottling Company and expect to receive a receipted bill. In the meantime upon further in-vestigation we learned that the company does not ship anywhere except in the State of Rhode Island.

"In other words, it appears this is the only one made outside of the State."

The defendant never heard of the word "Clover" used in connection with carbonated beverages prior to its own adoption of it in 1943 in Rhode Island.

The defendant's predecessor started business in Rhode Island in March, 1943 as the Clover Club Bottling Company. The words "Clover Club" together with the pictorial four leaf clover have been used on the defendant's and its predecessor's soft drink products since that time.

William H. Garrahan, president of the defendant, testified that the selection of the name "Clover Club" was motivated by sentiment; that there was in Boston a non-business organization named "Clover Club" which was composed of persons of Irish lineage among whom were many of his friends and that he tied that name with the luck of the Irish for four leaf clovers.

Garrahan also testified that it was the defendant's policy to confine its sales to Rhode Island, although there might have been four or five isolated instances where defendant's products were sold interstate and that such policy was pursued in order to avoid conflict with certain federal legislation, such as wage and hour laws, etc. The plaintiff's investigator seems to corroborate this testimony by his letter of January 25, 1949, which is quoted above.

The defendant advertises in Rhode Island newspapers, on billboards and in programs. The name "Clover Club" and the pictorial four leaf clover are used on defendant's cases, bottles, labels and crowns in which the defendant has invested about $65,000.

The defendant registered its trade-mark in Rhode Island on April 3, 1947 for ginger ale, soda water and carbonated beverages and syrups for making the same and the essential feature of the trade-mark consists of the reproduction of a four leaf clover used in connection with the phrase "Clover Club."

The defendant did not learn of the plaintiff until it received plaintiff's attorney's letter dated September 28, 1948, warning the defendant to discontinue the use of the plaintiff's alleged trade-marks.

A witness for the defendant testified that from 1925 to 1930 he was in the bottling trade; that from 1932 to 1950 he was with the Concordade Company; that about a year and a half ago was the first time he heard of the plaintiff and that it was only recently he saw plaintiff's advertisements in trade papers.

Another witness connected with the purchasing department of the First National Stores, which has a chain in New England and part of New York, testified that he has purchased the defendant's products for five or six years and that he never heard of the plaintiff or its products. He further testified that the First National Stores took over a chain of Cloverdale stores and that the name Cloverdale was used in connection with tuna fish, cheese, salmon and oleomargarine.

There is no evidence of confusion between the products of the plaintiff and defendant and there is no probability that there will be in the circumstances here. There is no evidence of the palming off the goods of the defendant as those of the plaintiff and the plaintiff admits that it has shown no monetary damage in this case.

There has been no fraud or conscious infringement on the part of the defendant whose use of its trade-mark grew up in a state where the plaintiff did not use its trade-marks for a period of about 17 years.

The evidence has not shown that a secondary meaning has become attached to plaintiff's trade-marks. Clearly, no such meaning has attached to the plaintiff's trade-marks in Rhode Island.

The plaintiff strongly relies on Cloverdale Spring Co. v. Risedorph, 1932, 144 Misc. 338, 257 N.Y.S. 750, in which it secured an injunction restraining the defendant there from using the name "Clover Club". In that case the defendant was engaged in the manufacture and sale of carbonated beverages similar to those of the plaintiff and used as a trade-mark a gold clover leaf and the name "Clover Club" was attached to its products. The plaintiff had twenty-seven distributors or wholesalers in New York at the time and its volume of sales in New York in 1931 was $121,000 and it expended $75,000 for advertising that year. The defendant was also in business in New York on a local basis. The facts in that case are clearly distinguishable from the facts in the instant case where the markets of the parties are so remote from each other. Furthermore, the evidence in the instant case, if it does not show abandonment of the trade-marks by the plaintiff, discloses long non-use in Rhode Island and tends to indicate that the plaintiff did not intend to re-enter Rhode Island with its products.

The percentage of net sales made by the defendant in interstate commerce was as follows: none in 1943 and 1944; 0.22% in 1945; 0.43% in 1946; 1.04% in 1947; 1.55% in 1948; and 1.15% in 1949. There is authority for the proposition that local intrastate sales, except for a few sporadic interstate sales, precludes relief to a plaintiff bringing an action of this sort. See C. B. Shane Corporation v. Peter Pan Style Shop, D.C., 84 F.Supp. 86; R. P. Hazard Co. v. Emerson's Shoes, D.C., 89 F. Supp. 211.

The defendant's activities have little or no effect on interstate commerce.

However, it is unnecessary to decide this case on jurisdictional grounds in view of my conclusion on the merits.

In General Baking Co. v. Gorman, 1 Cir., 3 F.2d 891, 893, 894, certiorari denied 268 U.S. 705, 45 S.Ct. 639, 69 L. Ed. 1167, the court said: "Plaintiff's learned counsel contend that the federal registration of its trade-mark in 1916 gave it a practically unlimited right of expansion, so that local bakers were thereafter charged with knowledge of its purpose to introduce in their communities 'Bond' bread, and were therefore prevented from adopting any trade-name which might conceivably infringe upon the 'Bond' trade-mark. This contention, on analysis, falls

little short of making federal registration of a trade-mark the equivalent of a patent or a copyright—a far-reaching proposition we cannot adopt. Nothing is better settled than that rights in trade-marks are of common-law origin, and are always 'appurtenant to an established business or trade in connection with which' they are employed. See Trade-Mark Cases, 100 U.S. 82, 25 L.Ed. 550; Ainsworth v. Walmsley, L.R. 1 Eq. 518, 524."

See also United Drug Co. v. Theodore Rectanus Co., 248 U.S. 90, 39 S.Ct. 48, 63 L.Ed. 141; Ammon & Person v. Narragansett Dairy Co., 1 Cir., 262 F. 880; Willson v. Graphol Products Co., Cust. & Pat.App., 188 F.2d 498.

The plaintiff's prayers for injunctive relief and damages are denied.

Judgment will be entered for the defendant, together with costs.