The OAKFORD COMPANY, Plaintiff,

v.

The KROGER COMPANY and Rushmore Paper Mills, Inc., Defendants.

Civ. A. No. P-1707.

United States District Court
S. D. Illinois, N. D.

Dec. 18, 1957.

454

Kavanagh, McLaughlin & Bond, Peoria, Ill., Loftus, Lucas & Hammond, Chicago, Ill., for plaintiff.

Miller, Westervelt, Johnson & Thomason, Peoria, Ill., for Kroger Co.

William A. Snow, Chicago, Ill., for Rushmore Paper Mills, Inc.

MERCER, District Judge.

This is an action for trademark infringement and unfair competition arising out of the Kroger Company's sale of "Blue Ribbon" paper napkins manufactured by its co-defendant, Rushmore Paper Mills, Inc. The defendant Rushmore counterclaims for infringement of its United States Trademark Registration No. 391,733 by plaintiff, The Oakford Company. The plaintiff is an Illinois corporation with its principal place of business in Peoria, Illinois, and defendant and counterclaimant, Rushmore Paper Mills, Inc., is a corporation of the State of New York, having an office and principal place of business at Gouverneur, New York.

The complaint alleges that plaintiff is engaged in the operation of a business which was founded in the City of Peoria, Illinois, in or about the year 1868 and has been in continuous operation since that time; and further alleges that the words "Blue Ribbon" were adopted as a trademark by the plaintiff's predecessor, Oakford and Fahnestock, in or about the year 1891 and plaintiff and its predecessor have since that time continuously used said words "Blue Ribbon" as a trademark on a great variety of quality grocery products sold and delivered by them and have since the year 1928 or 1929 also used said words "Blue Ribbon" to identify the members of an association of retail grocery stores sponsored and sup-

plied by them, and through it their "Blue Ribbon" grocery products have been sold to the purchasing public; that at the present time plaintiff uses said words "Blue Ribbon" on more than 200 such grocery products and to identify the approximately 200 members of an association of retail grocery stores which sells plaintiff's "Blue Ribbon" products. That by reason of such long and extensive use by plaintiff and its predecessor, and by reason of the plaintiff's commercial advertising program the trademark "Blue Ribbon" has long been and is now widely and generally known throughout the area served by the plaintiff and the approximately 200 retail stores supplied by it as identifying the plaintiff and its grocery products. It is further alleged that plaintiff's predecessor adopted the words "Blue Ribbon" as a trademark for paper products customarily offered for sale in retail grocery stores at least as early as 1904 and plaintiff and its predecessor has since used said words "Blue Ribbon" as a trademark on a variety of such paper products including writing tablets, toilet paper, napkins, paper envelopes, playing cards and paper towels.

That prior to the filing of this action but long after plaintiff and its predecessor had adopted, used and popularized the trademark "Blue Ribbon" and created a demand for plaintiff's "Blue Ribbon" grocery products, including paper products customarily offered for sale in retail grocery stores at least as early as 1904 and plaintiff and its predecessor has since used said words "Blue Ribbon" as a trademark on varieties of paper products, including writing tablets, toilet paper, napkins, paper envelopes, playing cards and paper towels.

That prior to the filing of this action but long after plaintiff and its predecessor had adopted, used and popularized the trademark "Blue Ribbon" and created a demand for plaintiff's "Blue Ribbon" grocery products, including paper products customarily offered for sale in retail grocery stores, the defendant, through retail grocery stores began the sale of and is continuing to sell paper products bearing the mark "Blue Ribbon", particularly paper napkins supplied by Rushmore Paper Mills, Inc., a New York corporation.

Plaintiff further alleges that the defendant's sale of paper products bearing mark of "Blue Ribbon" is likely to cause confusion, mistake or deception of purchasers as to the source of origin of said products and constitutes an infringement of plaintiff's trademark rights and unfair competition. The complaint invites the Rushmore Paper Mills, Inc., to join as a party defendant and Rushmore Paper Mills, Inc., has accepted the invitation and has filed an answer and counterclaim. The complaint seeks an injunction restraining the defendants from further infringement and seeks damages.

The counterclaim alleges that the defendant, Rushmore Paper Mills, Inc., directly and through its related companies, since 1909 has been and continues to be engaged in the manufacture, sale and distribution of paper products such as toilet tissue, toilet paper, paper towels, paper napkins, waxed paper and similar items; that the paper products manufactured and sold by defendant is distinctive and of high quality and that said products are identified by the trademark "Blue Ribbon" and that its trademark "Blue Ribbon" was registered in the United States Patent Office on March 6, 1934, Registration No. 319,733, and that this registration was republished under the Trademark Act of 1946, 15 U.S.C.A. § 1051 et seq., on May 10, 1949; that the defendant Rushmore is still the owner of said trademark and registration and that said trademark and registration is valid, subsisting, unrevoked and uncancelled.

It is further alleged that the defendant, Rushmore, has expended large sums of money in advertising its paper products under its trademark which has been employed extensively by defendant to identify its products and said trademark has been illustrated, advertised and displayed extensively at substantial cost to the defendant with the result that said trademark now represents vast good will

and has consequently become of great value to the defendant Rushmore in its continued manufacture and sale of its paper products. The counterclaim alleges that the use of said trademark by plaintiff is likely to cause confusion or mistake or deceive purchasers as to the source of origin of such goods, it being alleged that Rushmore products are sold under said trademark throughout the United States, including the State of Illinois, and alleges an infringement and seeks injunctive relief and damages. The counterclaim alleges as a further defense that the plaintiff is estopped to assert its claim against defendants because it is guilty of laches in asserting its claim, having had long prior knowledge of defendant's manufacture and sale of its paper products bearing the trademark "Blue Ribbon". Jurisdiction of this Court is grounded on diversity of citizenship.

The basic question presented by the complaint and counterclaim is whether the plaintiff, Oakford, or the defendant, Rushmore, has the exclusive right to use the trademark "Blue Ribbon" on paper products within the market area served by the plaintiff, said area being a large number of counties in Northern Illinois, outside of Cook County area, and counties in Western, Central and Eastern Illinois, and a limited area in Eastern Iowa. The right of the defendant Rushmore to use the mark on paper products outside of this particular market area is not challenged and is not an issue in this case.

The evidence relative to trademark use establishes that plaintiff's predecessor, Oakford and Fahnestock, adopted "Blue Ribbon" as a trademark for canned vegetables and fruits in May, 1891 and obtained a United States Trademark Registration covering the use of the mark on such goods on June 21, 1892. By August 26, 1913, it had obtained three additional Federal registrations covering "Blue Ribbon" as the trademark for some 70 different grocery products and that it actually used the "Blue Ribbon" mark on a substantial number of additional grocery products not specified in any of its federal registrations, and that plaintiff continued to extend its use to other products and by January, 1954, the trademark was being used by it on more than 200 different grocery items.

The evidence further discloses that Oakford and Fahnestock had extended its use of the "Blue Ribbon" mark to roll paper, toilet paper, pencil and ink tablets as early as August 15, 1898. Plaintiff's predecessor was using the "Blue Ribbon" trademark on ruled ink tablets by May 27, 1904; on toilet paper and tablets, in 1910. This proof was established by cost book pages; by a series of witnesses employed by plaintiff's predecessor prior to the year 1904, it appearing that the witnesses were actually on the road selling from cost books. These cost book pages together with invoices, inventory sheets, order forms, sales tabulation sheets, labels, newspaper advertisements and hand bills, all of which were introduced in evidence by plaintiff, established that plaintiff and its predecessor have continuously used the "Blue Ribbon" trademark on a variety of paper products of the type customarily offered for sale in retail grocery stores since prior to July, 1912, which is the earliest date of use of the mark claimed by the defendant, Rushmore.

The documentary evidence of plaintiff further establishes that there has been a continuous use of "Blue Ribbon" as a trademark for toilet paper since 1910; for paper tablets from 1904 to 1949; on roll paper from 1911 to 1945; on paper napkins since 1937; on paper towels since 1938; on paper envelopes from 1914 to 1917; on playing cards in 1927 and 1928; and on wax paper since 1939. In addition is the testimony of C. W. Farber, the operator of a retail grocery store in Geneseo, Illinois, who testified that he had been handling "Blue Ribbon" groceries and paper products supplied by plaintiff and its predecessor continuously since 1905. The witness, Otto Jeck testified that he had been selling such toilet paper for plaintiff and its predecessor continuously since 1910.

Other witnesses also testified that they were employees of the plaintiff and that during certain periods they had stocked, shipped or sold paper products bearing the trademark "Blue Ribbon", the said witnesses so testifying and period testified to being as follows: Samuel E. Green, 1898 to 1923; H. R. Shofe, 1901 to 1919; Stephen Eades, 1902 to 1954; A. W. Oakford, 1903 to 1946; Roy Hamil, 1903 to 1939; Maynard Hawkins, 1910 to 1914; Benjamin C. Ellis, 1910 to 1957; Clyde R. Brewer, 1911 to 1938; and C. C. Oakford, 1924 to 1947.

The evidence also establishes that in 1929 plaintiff's predecessor began using its "Blue Ribbon" trademark to identify the members of an association of retail grocery stores sponsored and supplied by plaintiff's predecessor; that there were more than 400 stores in this association at the time of its formation and that this number subsequently increased to more than 600 stores; that the location of these stores as shown on Plaintiff's Exhibit 131 defines the market area served by the plaintiff. The "Blue Ribbon" signs which identified the member-stores of this association were furnished each week along with posters and other promotional material advertising the plaintiff's "Blue Ribbon" groceries and paper products. Posters and hand bills were also used and the "Blue Ribbon" stores were publicized through weekly advertisements in the Peoria newspapers and occasional advertisements in other publications such as the Prairie Farmer and American Family magazines. Semi-annual "Blue Ribbon Days" were also promoted by plaintiff and its predecessor.

The evidence further discloses that extensive advertising was used through media located in and directed at the market area served by plaintiff. Advertisements had been carried weekly by the Peoria newspapers since 1926. Additional advertising had been used since 1928 and in a number of instances "Blue Ribbon" paper products were featured in the weekly "Blue Ribbon" stores advertisements as well as an advertisement of grocery items. The plaintiff expended approximately $90,000 for these weekly advertisements in the 10-year period, 1945 through 1954. Radio advertisement has been used in Peoria since August of 1932. The commercial announcements featured the plaintiff Oakford's "Blue Ribbon" and "America's Cup," these announcements having been delivered daily over Radio Station W. M. B. D. In addition to the newspaper and radio advertising, plaintiff also used bus and street car cards, some of which were in use as early as 1920. Courtesy benches and billboard advertising was also employed. Advertising schedules, being a part of the record, reveal that plaintiff expended in excess of $80,000 in the 5-year period from 1950 through 1954 for advertising purchased through an advertising agency, this amount being in addition to the $90,000 advertising expense heretofore referred to. The advertising of "Blue Ribbon" trademark was also prominently displayed on plaintiff's trucks and buildings; on napkins distributed to churches and lodges; on displays and demonstrators in retail groceries located throughout the plaintiff's market area, this use being as far back as 1915.

All of the testimony above set forth, in the opinion of the Court, affords convincing proof that the long use and extensive advertising of the trademark "Blue Ribbon" by plaintiff and its predecessor, have caused "Blue Ribbon" to become known in the market area served by the plaintiff as identifying the plaintiff and its paper products as well as food products. Numerous grocers engaged in the retail grocery business in Peoria testified that they had never heard of any product bearing the trade-mark "Blue Ribbon" other than the products of plaintiff and its predecessor. The periods involved in the testimony of these retail grocers cover a period since the year 1905.

As to the trademark use by the defendant, the testimony indicates that Rushmore has continuously used "Blue Ribbon" as a trademark on paper products sold by it from the time of its formation

in 1912 and its use of the mark on toilet paper as early as 1914 and in the following years on a variety of other paper products, including waxed paper, paper towels, and napkins. The defendant's evidence shows a sale in the plaintiff's market area as heretofore described, on April 16, 1938, on which date a shipment of Rushmore's "Blue Ribbon" wax paper having a value of $7.20 was made to the T. M. Gibble Company of Clinton, Iowa. During an 8 to 10-year period following this sale the evidence shows sales to purchasers in Danville, Springfield, and Peoria, Illinois. The sale in Peoria consisted of 215 cases of "Blue Ribbon" napkins sold to the Kroger Company in 1940, and 15 cases of "Blue Ribbon" kitchen towels sold to F. W. Woolworth during the period 1943 to 1945. It was not until 1946 that Rushmore's "Blue Ribbon" napkins began to be shipped into the defendant Kroger's warehouses in any substantial volume. The evidence also discloses that isolated sales of the Rushmore paper products were made to purchasers in Davenport, Burlington, and Muscatine, Iowa, in 1947, 1951 and 1953.

As to advertising, the evidence discloses that the defendant, Rushmore, did no advertising until the year 1942 and that it was not until 1947 that the combined expenditures of Rushmore for advertising throughout the United States equalled or exceeded the plaintiff Oakford's expenditures in advertising. Since 1948 the annual advertising expenditures of Rushmore have increased substantially. A small portion of Rushmore's advertising has been done through media which reached the market area served by the plaintiff. Rushmore has never advertised in any newspaper or over any radio or television station in the State of Illinois outside Chicago and Rushmore ran its first ad in a Chicago newspaper in September, 1947. Since 1947 Rushmore has run occasional ads in the major Chicago newspapers and since 1949 it has advertised over two Chicago radio stations and has done some television advertising over Chicago's WGN–TV.

In considering the testimony as herein set forth, probably to a larger degree than is necessary, it is the opinion of the Court that the exclusive right to use the trademark "Blue Ribbon" on paper products within its market area is vested in the plaintiff Oakford as the first user of the mark on such products and cannot be divested by the defendant Rushmore's registration trademark in the United States patent office. Inasmuch as the evidence establishes that plaintiff and its predecessor have been using "Blue Ribbon" as a trademark on toilet paper and other paper products since prior to 1912 when the defendant Rushmore came into existence, there appears to be little question that plaintiff has the exclusive right to use that trademark on paper products within the market area served by it, irrespective of the fact that the defendant is the registered owner of a trademark on such products. Hanover Star Milling Co. v. Metcalf, 240 U.S. 403, 36 S.Ct. 357, 60 L.Ed. 713; United Drug Co. v. Theodore Rectanus Company, 248 U.S. 90, 39 S.Ct. 48, 63 L.Ed. 141; General Baking Co. v. Gorman, 1 Cir., 3 F.2d 891; General Baking Co. v. Goldblatt Brothers, 7 Cir., 90 F.2d 241; Esso, Inc., v. Standard Oil Co., 8 Cir., 98 F.2d 1.

In United Drug Co. v. Theodore Rectanus Company, the evidence established that Mrs. Regis, the United Drug Company's predecessor, had begun using the mark "Rex" on drug products in 1877 and later procured its registration from the United States patent office; that Rectanus had not used the mark until about 1883. The Court held that Rectanus was entitled to be protected against United Drug Company in the Louisville, Kentucky vicinity, the area where Rectanus had been the first user of the mark. Some of the observations of the Court in the United Drug Company case appears to this Court as being quite pertinent in the present case. The Court in the United Drug Company case observed that:

"It would be a perversion of the rule of priority to give it such an ap-

plication in our broadly extended country that an innocent party who had in good faith employed a trademark in one state, and by the use of it had built up a trade there, being the first appropriator in that jurisdiction, might afterwards be prevented from using it, with consequent injury to his trade and good will, at the instance of one who theretofore had employed the same mark, but only in other and remote jurisdictions, upon the ground that its first employment happened to antedate that of the first-mentioned trader."

The Court further observes:

"And it results, as a necessary inference from what we have said, that petitioner, being the newcomer in that market, must enter it subject to whatever rights had previously been acquired there in good faith by the Rectanus Company and its predecessor. To hold otherwise—to require Rectanus to retire from the field upon the entry of Mrs. Regis' successor—would be to establish the right of the latter as a right in gross, and to extend it to territory wholly remote from the furthest reach of the trade to which it was annexed, with the effect not merely of depriving Rectanus of the benefit of the good will resulting from his long-continued use of the mark in Louisville and vicinity, and his substantial expenditures in building up his trade, but of enabling petitioner to reap substantial benefit from the publicity that Rectanus has thus given to the mark in that locality, and of confusing if not misleading the public as to the origin of goods thereafter sold in Louisville under the Rex mark, for, in that market, until petitioner entered it, 'Rex' meant the Rectanus product, not that of Regis." United Drug Company v. Theodore Rectanus Company, 1918, 248 U.S. 90, 100–102, 39 S.Ct. 48, 52, 63 L.Ed. 141.

The Court is also impressed by the decisions in General Baking Co. v. Gor-man, 1 Cir., 3 F.2d 891, and General Baking Co. v. Goldblatt Brothers, 7 Cir., 90 F.2d 241. These cases held the rights of a prior local user of "Bond" (on bread) to be superior to those of the General Baking Company which owned a Federal registration of the mark and in both cases could show prior use in other areas. Of significance as to a Federal registration, the Court of Appeals for the First Circuit stated as follows:

"Plaintiff's learned counsel contend that the federal registration of its trade-mark in 1916 gave it a practically unlimited right of expansion, so that local bakers were thereafter charged with knowledge of its purpose to introduce in their communities 'Bond' bread, and were therefore prevented from adopting any trade-name which might conceivably infringe upon the 'Bond' trademark. This contention, on analysis, falls little short of making federal registration of a trade-mark the equivalent of a patent or a copyright —a far-reaching proposition we cannot adopt. Nothing is better settled than that rights in trade-marks are of common-law origin, and are always 'appurtenant to an established business or trade in connection with which' they are employed. See In re Trade-Mark Cases, 100 U.S. 82, 25 L.Ed. 550; Ainsworth v. Walmsley, L.R. 1 Eq. 518, 524.

"Rhode Island cannot be deprived of the power to protect its citizens in the good will of their business by federal registration of a trade-mark for interstate commerce." General Baking Co. v. Gorman, 1 Cir., 1925, 3 F.2d 891, 893, 894.

It appears to this Court that the "Bond" bread cases hold that the right to a Federal trademark registration and the right to use the trademark in a particular area are separate and distinct from one another and that the right to use the trademark in a particular area does not flow from the right to a Federal trademark registration and it would necessarily follow that the decision of

the Examiner of Interferences in the patent office proceeding between the plaintiff Oakford and the defendant Rushmore, is wholly beside the point in the present case where the right in controversy is the right to use the mark on paper products sold within the market area of the plaintiff.

■ Since the evidence in this case shows that plaintiff's predecessor was not only the first to use "Blue Ribbon" as a trademark on paper products in the market area in controversy, but the first to use the mark on such products anywhere, the defendant's subsequent sale of "Blue Ribbon" paper napkins within such market area constitutes a clear infringement of plaintiff's common-law trademark rights entitling plaintiff to the injunctive relief prayed for in its complaint.

■ Another basis upon which plaintiff is entitled to injunctive relief is afforded by the evidence showing that within its market area the words "Blue Ribbon" have acquired a secondary meaning identifying the plaintiff and its products. In Jewel Tea Co. v. Kraus, D.C., 88 F.Supp. 1003, and Jewel Tea Co. v. Kraus, 7 Cir., 187 F.2d 278, the District Court and Circuit Court of Appeals set forth the elements generally considered in determining whether a word or name has acquired a secondary meaning. These elements are length of use; nature and extent of advertising, and efforts to promote a public consciousness with a particular product of business. In the present case the evidence is impressive on each of these points. As to the length of use, the evidence discloses plaintiff and its predecessor have been using the "Blue Ribbon" mark for 65 years on an ever increasing number of items. As to the nature and extent of advertising, the plaintiff and its predecessor have extensively advertised the "Blue Ribbon" line of products through a wide variety of advertising media for more than 25 years. Finally, plaintiff and its predecessor have made vigorous efforts to promote a public consciousness connecting the name "Blue Ribbon" with their products and with

the business itself. Added to this is the testimony heretofore referred to of the retail grocers, establishing that within the market area served by it, "Blue Ribbon" is recognized as meaning The Oakford Company and its products. In the Court's opinion this evidence establishes that in Peoria and throughout the plaintiff's market area an association exists in the minds of the public between the words "Blue Ribbon" and the plaintiff's business and products which entitles plaintiff to an injunction against the defendant's use of "Blue Ribbon" on paper napkins in said market area.

■ The defendant Rushmore asserting that plaintiff has been guilty of laches in asserting its claim against them is not as a matter of law a bar to an injunction against future use of infringement of use of a trademark, but merely a bar to the recovery of profits and damages based on its past infringement. That it would not bar plaintiff from injunctive relief against future infringement is clear from the Supreme Court's decision in McLean v. Fleming, 96 U.S. 245, 24 L.Ed. 828, in which case the Court observed as follows:

"Acquiescence of long standing is proved in this case, and inexcusable laches in seeking redress, which show beyond all doubt that the complainant was not entitled to an account nor to a decree for gains or profits; but infringement having been proven, * * * the injunction was properly ordered * * *" McLean v. Fleming, 1877, 96 U.S. 245, 258, 24 L.Ed. 828.

In Menendez v. Holt, the Court said:

"Counsel in conclusion earnestly contend that whatever rights appellees may have had were lost by *laches,* and the desire is intimated that we should reconsider McLean v. Fleming, 96 U.S. 245 [24 L.Ed. 828], so far as it was therein stated that even though a complainant were guilty of such delay in seeking relief upon infringement as to preclude him from obtaining an account of gains and profits, yet if he were

otherwise so entitled, an injunction against future infringement might properly be awarded. We see no reason to modify this general proposition, and we do not find in the facts as disclosed by the record before us anything to justify us in treating this case an exception. The intentional use of another's trade-mark is a fraud; and when the excuse is that the owner permitted such use, that excuse is disposed of by affirmative action to put a stop to it." Menendez v. Holt, 1888, 128 U.S. 514, 523, 9 S.Ct. 143, 145, 32 L.Ed. 526.

The question of damages has not been presented to this Court and in the opinion of the Court it is not necessary to pass upon the question as to whether or not the plaintiff is guilty of laches.

■ Application of the rule of law established by the Supreme Court's decisions in Hanover Star Milling Co. v. Metcalf, and United Drug Co. v. Theodore Rectanus Company, to the evidence in this case which establishes that plaintiff's predecessor was using "Blue Ribbon" as a trademark on toilet paper and other paper products before the defendant Rushmore was in existence, necessarily precludes the defendant Rushmore from recovering on its counterclaim for infringement on its federal trademark registration No. 319,733. All that plaintiff's evidence need establish to give it a complete defense to Rushmore's counterclaim is that plaintiff has continuously used the "Blue Ribbon" mark on paper products at a period of time and since the date of May 10, 1949, this being the date when the Rushmore registration was published under the applicable statute.

Plaintiff seeks in addition to the injunctive relief against the defendant, a determination of the right to registration and seeks an order of cancellation of registrations in whole or in part. The Court does not feel constrained to order the Commissioner of Patents to cancel the Rushmore registration in part, that is to say, in the market area as shown by Plaintiff's Exhibit 131.

Other questions have been raised in the briefs of both parties but in view of the Court's decision it is not necessary to pass upon said matters.

It is ordered that judgment be entered in favor of the plaintiff and against the defendant on the complaint filed herein and that judgment be entered in favor of the counterdefendant and against the counterclaimant on the counterclaim filed herein; and it is further ordered that the defendants be enjoined from using the mark "Blue Ribbon" within plaintiff's market area, being certain counties in Northern Illinois, and Western, Central and Eastern Illinois, and certain counties in the State of Iowa, the said market area and the said counties being shown in Plaintiff's Exhibit 131. These counties should be specified by name in the findings of facts.

It is further ordered that counsel present a proper findings of fact and conclusions of law based upon this Opinion, in compliance with Rule 52. Rules of Civil Procedure, 28 U.S.C.A., within twenty days.