## MAY et al. v. GOODYEAR TIRE & RUBBER CO.

No. 3617.

District Court, D. Massachusetts.
Feb. 15, 1935.

Phipps, Durgin & Cook, of Boston, Mass., for plaintiffs.

Walter Powers (of Sherburne, Powers & Needham), of Boston, Mass., John Vaughan Groner (of Fish, Richardson & Neave), of New York City, and R. H. Waters, of Akron, Ohio, for defendant.

BREWSTER, District Judge.

This bill of complaint is brought to enjoin the use by defendant of registered trade-marks which, according to the allegations of the bill, infringe rights of the plaintiffs.

Statement of Facts.

The facts readily fall into several groups. I will first state those relating to the defendant's trade-marks and their use.

1. The defendant, Goodyear Tire & Rubber Company, was incorporated under the laws of Ohio in 1898 with a usual place of business in Akron, Ohio. Its business is the manufacture and sale of rubber goods including rubber tiles, rubber tires, rubber heels, and rubber soles. The defendant at no time has manufactured or sold ladies' leather boots or shoes.

2. In 1900, the president of the Goodyear Tire & Rubber Company conceived the idea, taken from a statue of Mercury with the conventional winged sandals, of using a winged foot as a part of the Goodyear trade-mark, and from that time the defendant has used, in connection with its business as manufacturer of rubber tiles, rubber tires, rubber heels, and rubber soles, a trade-mark substantially as follows:

Since 1901, the trade-mark has appeared upon the letterheads of the defendant and, from time to time, upon circulars and other advertising matter to be referred to more particularly hereafter.

In May, 1905, the defendant filed application with the United States Commissioner of Patents for the registry of a trade-mark similar to the above which shows a representation of a human foot with sandal attached to or strapped at the bottom thereof and with a wing growing from the ankle, with the words "Goodyear" divided so that the word "Good" appeared at the left of the foot and the word "Year" at the right. The trade-mark was registered in 1906 and duly advertised on September 26, 1906, in accordance with the provisions of section 6 of the Act of February 20, 1905 (see 15 USCA § 86). No opposition having appeared, the certificate of registration was issued on November 3, 1906.

For the purposes of this case the defendant has conceded that it did not use this trade-mark on heels or soles prior to 1905. Beginning in 1906, the defendant continuously manufactured and sold rubber and composition heels and soles bearing the said

trade-mark or some variant thereof, the trade-mark being affixed by being molded as a part thereof in the process of manufacture.

Beginning in 1914, the defendant has used another trade-mark for its heels and soles which was duly registered in 1923. The trade-mark was registered after notice of the application had been published, as required by law, and no objections were interposed. The following is a copy of the trade-mark:

3. The heels and soles bearing the defendant's trade-marks were sold in interstate commerce throughout the United States. Before 1931 defendant's market had been extended to include nearly every country in the world. The Good (winged foot) Year mark had been registered in 77 foreign countries and the Wing (winged foot) Foot mark in 44 foreign countries. Sales were made either to manufacturers or to distributors who sold to cobblers.

4. The defendant advertised extensively in the Saturday Evening Post from May, 1914, through October, 1933. From May, 1914, to September, 1917, it expended for such advertising over $80,000. With immaterial exceptions every advertisement showed the trade-mark composed of the word "Goodyear" associated with the winged foot and/or the word "Wingfoot" associated with the winged foot, the combination of the three sometimes varying.

I do not find in the Saturday Evening Post prior to August, 1928, any advertisement showing defendant's rubber soles which had impressed upon the sole the defendant's trade-mark.

The defendant also advertised extensively in the shoe trade magazines, such as the Shoe & Leather Reporter and the Boot & Shoe Recorder. These advertisements prominently displayed the Goodyear trademark. In some of these advertisements, the soles carried the Goodyear trade-mark as early as July, 1913.

For two years, beginning in 1919, the defendant carried on an extensive co-operative advertising campaign which consisted of advertisements in magazines having a national circulation, in the shoe trade magazines, and in local newspapers; and also through the mail and by displays in stores. Each advertisement was of the product of a specific shoe manufacturer, but each featured the use of the Goodyear heels or soles on that product. The cost of this advertising was, in some cases, borne wholly by the defendant. In others, it contributed a portion. The total cost of this campaign was over $130,000.

From 1919 through 1928, the defendant also advertised extensively throughout the United States by means of colored card advertisements in street railway cars. These cards displayed the trade-mark in one form or another. In this form of advertising it spent over $2,000,000 between 1919 and 1928. These advertisements appeared in the street cars in New England, some of the time with one card in every street car, and at other times with a card in every other street car. The street railways carrying this advertisement ran cars in Greater Boston and in the larger cities throughout New England. In no advertisement did the defendant hold itself out to be a manufacturer of boots or shoes.

5. The plaintiffs base their asserted rights as owners of a trade-mark which one Hervey E. Guptill used in connection with his business of manufacturing women's shoes. His product was wholly light-weight, dress shoes or slippers, known as "turned" shoes. He was engaged in the manufacture of such shoes from 1899 until 1922 in Haverhill, where he owned a six or seven story factory and employed some 300 employees, doing an annual business of between $600,000 and $1,000,000 toward the close of the above period.

On September 11, 1902, Guptill filed an application for the registration of a trademark of which the following is a copy:

The mark was duly registered on May 12, 1903, by the United States Patent Office. According to the file wrapper, Guptill limited himself to the mark, as shown in the ap-

plication, when used on or in conjunction with "ladies' leather boots and shoes."

From the beginning of the use of his registered trade-mark in advertising, Guptill surrounded the picture of a winged foot, whenever he used it, with a representation of a sunburst larger than the winged foot and more conspicuous.

The Guptill product had a good reputation in the trade and was sold throughout the United States, in South America, Australia, and in other foreign countries until 1922. No figures were introduced showing the extent of Guptill's output during the period 1903 to 1922.

6. Guptill advertised his product in the Boot & Shoe Recorder, in Modern Shoemaking, and in Illustrated Footwear Fashions, but not until January 14, 1903, did his trade-mark first appear in his advertising.

From 1903 to 1918 Guptill advertised in the trade publications above referred to. In all advertisements he prominently displayed the name "Guptill" written in a distinctive script. In only a portion of his advertisements did the trade-mark appear. Between 1904 and 1912, when Guptill ceased to advertise in the Boot & Shoe Recorder, a weekly publication, he had used his trade-mark in only sixty-five issues of that publication. In Illustrated Footwear Fashion, a monthly, Guptill advertised in every issue beginning June, 1900, until it went out of existence in 1911. His trade-mark was shown in only seven issues in 1910. Beginning in 1911 and continuing to 1918, his trade-mark appeared in all issues of Oran McCormick's Footwear Fashion and its two succeeding magazines published each month. From March, 1915, to October, 1918, the trade-mark appeared in each issue as a part of Guptill's advertisement therein. After 1918 Guptill ceased all advertising. These publications were confined to the boot and shoe trade. None had a large circulation. Guptill also used his trade-mark on his stationery, on cards, on containers for his shoes, and in some of his catalogues issued after 1913. The mark appeared in one form or another on shoes which he manufactured, except in instances where dealers requested otherwise.

During this period, from 1903 to 1918, the trade-mark had been modified so that the circle of rays in the form of a sunburst was its outstanding and dominant element, the winged foot being a relatively small part of the trade-mark.

The trade-mark was never known as the Wingfoot mark, nor did Guptill's products, in the mind of the public, ever become identified with a "Wingfoot" shoe. Generally, it may be said that Guptill's use of his mark was at all times confined to a limited class of buyers, was never continuous, and the purchasing public or shoe trade would not be likely to associate the winged foot with the Guptill product unless it appeared in connection with the word "Guptill" in the distinctive script prominently displayed in all advertisements. It is a fair inference that Guptill's good will had been built around his trade-name "Guptill" quite as much as around his trade-mark. It was the name more than the winged foot that suggested the origin of goods manufactured by him.

7. On December 20, 1921, an involuntary petition in bankruptcy was filed against Guptill which terminated in 1922 by a composition prior to adjudication whereby creditors were paid 35 per cent. in cash. In order to raise the cash to put through the composition, Guptill entered into an arrangement with one Charles E. Greenman, by the terms of which Greenman paid $46,-000 to Guptill and received a conveyance through Guptill's attorney of "all stock in trade, machinery, fixtures, shares of stocks, shoes material, accounts receivable, and all other personal property, including choses in action, of whatever name, nature or description" he had at the time of the conveyance. The transfer was absolute in form and not conditional or defeasible. The assignment contained no reservation of trade-mark rights or good will of Guptill's business. Under it, Greenman took possession of all records, books of account, and all personal property formerly employed by Guptill in his shoe manufacturing business.

Following the transfer, a small factory was started in Seabrook, N. H., in which the machinery acquired by Greenman from Guptill was installed. The business of manufacturing ladies' leather shoes was carried on under the name of Hervey E. Guptill, Inc., although, in fact, it was never incorporated. Nor was any certificate filed in compliance with the statutes of New Hampshire (Pub. Laws 1926, c. 155, § 1) requiring one doing business under any name other than his own to file a certificate to that effect. Guptill was put in charge of manufacturing, upon a salary paid by Greenman. It appears that Greenman took an active part in the affairs of the company, attending to the finances and correspond-

ence and, for a time, received a salary. He alone financed the operations of the business, Guptill furnishing no capital whatever.

Early in 1926, Greenman employed one Kennedy, a shoe manufacturer, and put him in charge of the business, and from that time Guptill's connection with the company was merely that of outside salesman, which position he occupied until November, 1926, when he severed all connection with the business. At all times after Greenman acquired the assets from Guptill, he continued to use not only the name "Hervey E. Guptill, Inc.," but all trade-marks and trade-names of Guptill upon stationery and, to some extent, upon the output of the small plant in Seabrook. This use was with the knowledge and consent of Guptill. Greenman, having lost money in the enterprise, told his daughter, who in the meantime had been employed as bookkeeper, and Kennedy, that if they wanted to continue the business they could do so, but that Kennedy must assume all financial responsibility. From November 15, 1926, to the fall of 1927, Kennedy assumed charge of the business and continued it under Guptill's name and with the use of the Guptill trade-mark upon shoes, unless the customers requested otherwise.

When Kennedy gave up the business, having found it unprofitable, all the assets which Greenman had acquired from Guptill were sold and removed from Seabrook. This sale marked the end of the business which had theretofore been carried on by Guptill.

While it may be conceded that Greenman did not intend to permanently embark upon the business of manufacturing shoes and that Guptill may have expected to redeem the business after Greenman was repaid, these expectations were never realized, and the end result was that the business, in connection with which the Guptill trade-mark had been used from the time of its registration, had been transferred to Greenman and in 1927 wholly discontinued. I so find.

8. On December 30, 1926, Hervey E. Guptill died. At that time he was not employed or engaged in any business whatsoever. There had been preliminary negotiations during the last days of his life looking to the establishment, with others, of a new business, but none of these plans had proceeded beyond the preliminary stages and, of course, were abandoned immediately upon Guptill's death.

Guptill left a will giving a small bequest to his daughter and the residue to his widow. The will did not specifically mention any business, good will, choses in action, or any rights in his trade-mark. It was not admitted to probate until April 23, 1929. Guptill left no estate. He did not even possess the certificate of registration.

Early in 1928, Guptill's widow, who was named as executrix in the will, wrote to Miss Greenman as follows:

"If you have no further use of the trade mark papers, I would like to keep them. I do not think they have any monetary value, but it was something Hervey originated, and as such I would like to have them to keep, perhaps I am asking too much, but I have so little of anything that he did, besides he thought so much of them."

In response to this letter the trade-mark registration was sent to Mrs. Guptill.

When Guptill died, his daughter, one of the plaintiffs in this suit, was employed in a shoe factory in Lynn, where she remained until February, 1927, when she obtained employment in the Ideal Baby Shoe Company in Danvers. Neither Guptill's widow nor his daughter carried on any business in which Guptill was engaged or which could be said to be a continuation of Guptill's business.

9. In 1928, the plaintiffs, with a third party, started manufacturing infants' shoes under the name of "Hervey E. Guptill, Inc." In September of that year a corporation was organized under that name in which the plaintiffs were incorporators. This corporation continued in the business of manufacturing infants' shoes until November, 1928, when it discontinued manufacturing, and thereafter the business was continued as a partnership by the two who are plaintiffs in this suit. Neither the corporation nor the partners acquired any rights from Greenman, nor did they continue any business in which Hervey E. Guptill had been formerly engaged and to which the trade-mark had been attributed.

I find that no business was acquired from the estate of Hervey E. Guptill by the corporation or by the plaintiffs as copartners, nor did they acquire any of the assets which had been employed by Guptill or by Greenman in the conduct of the business of manufacturing ladies' shoes, except possi-

bly certain dies which plaintiffs appropriated before or after the business of Guptill was abandoned and which passed to Greenman by virtue of the transfer to him.

The corporation kept no books of account and practically no records, and what few records it kept were destroyed by the plaintiffs after this suit was instituted. It did very little advertising and its gross business during the whole period of its existence did not exceed $4,000. The corporation was dissolved in 1931. The evidence is conflicting as to the extent to which the corporation used the Guptill trade-mark. The testimony of the plaintiffs that it was used on infants' shoes, sold by them, is not supported by any corroborating evidence, and letterheads used during part of the time did not show the Guptill trade-mark.

The plaintiffs, as copartners, have carried on in a small way the business of manufacturing and selling infants' shoes and are known to the trade only as manufacturers of babies' shoes. The gross business during any one year between 1928 and 1931 did not exceed $7,000.

In May, 1930, plaintiffs were manufacturing in a barn in Seabrook, but being unable to pay the rent they moved out of the barn and thereafter carried on the manufacture in the dwelling house where the plaintiff Guptill lived.

They have kept only meager books of account. They have, in some instances, marked the soles of the shoes with the winged foot surrounded by a sunburst, have used the trade-mark on labels on containers for the shoes and on business cards.

10. In August, 1928, the plaintiffs consulted an attorney in Lynn regarding their rights to proceed against the defendant, and the attorney wrote, under date of August 15, 1928, to the defendant that its use of the winged foot trade-mark was an infringement of trade-mark used by Hervey E. Guptill. Following this letter, an attempt was started to perfect the plaintiffs' rights by going through the formality of getting certain assignments from Mrs. Guptill, as residuary legatee and executrix of Mr. Guptill's will, of whatever rights she had in the trade-mark. The plaintiffs' contention respecting an oral assignment in May, 1928, to the corporation is not sufficiently proved. The same may be stated respecting an alleged written assignment of August, 1928, which has disappeared. Furthermore, Guptill's will had not then been probated.

The first recorded assignment was made in December, 1929, and recorded in the United States Patent Office December 30, 1929. This document was executed by the plaintiff Guptill, as treasurer of the corporation above referred to, and by Mrs. Guptill, individually and as executrix of the estate of Hervey E. Guptill, deceased. In the recitals contained in this instrument, there were the following, among others, that the residue of Guptill's property included his business and all assets thereof, good will, trade-mark, and other property used in or belonging to said business: That Guptill's shoe manufacturing business was conducted by his daughter until September 10, 1928; that on that date an assignment had been executed by the widow, individually and as executrix, and by the daughter to the corporation; that the corporation had sold and disposed of its business and all its assets to the plaintiffs as copartners—all of which statements were not in accordance with the established facts.

It is not claimed that the plaintiffs derived any rights from Guptill's transferee, Greenman.

11. In 1932 the plaintiffs applied to the United States Patent Office for a renewal of the certificate of registration, which renewal was granted on December 27, 1932. In applying for the renewal, the plaintiffs disclosed to the Patent Office only the will of Guptill and the appointment of his widow as executrix and the assignment of December, 1929.

12. There was never any competition between the defendant and Hervey E. Guptill, and especially was this so between the defendant and plaintiffs' corporation or copartnership. Guptill and the defendant were not selling competitive products. The respective markets of Guptill and the defendant were at all times different. Guptill sold shoes to retailers only, and the defendant sold to shoe manufacturers and to distributors who resold to cobblers. The trademarks were dissimilar and could not be mistaken one for the other. The use of the defendant's trade-mark did not lead to any confusion in the public mind and would not lead to a purchaser mistaking the defendant's product for the plaintiffs'. The defendant adopted its trade-mark in good faith and without knowledge of the existence of Guptill's business or his trade-mark, and consequently it was never used by the defendant with any intent to injure Guptill or his business, nor can it be found that

the use of it by the defendant did in any way, or in any degree, affect adversely the business of Guptill or invade any field occupied by him. The case is entirely barren of any evidence tending to show that the defendant designed to appropriate, or ever did appropriate, Guptill's good will or trade upon the reputation of his product. The defendant did not pass off, or intend to pass off, its goods for the goods of Guptill. No purchaser would have any difficulty whatever in discriminating between the products of Guptill and of the defendant, or between Guptill's trade-mark and labels and the defendant's trade-marks and labels.

### Conclusions of Law.

The plaintiffs are copartners who have succeeded to the business which they had previously conducted as a corporation. The business of the corporation and the copartnership was and is the business of manufacturing and selling infants' shoes. The earliest entrance of the corporation into the field was in May, 1928. Their business has been conducted on a small scale. The product and the market are extremely limited compared with that of the defendant. They have stamped, somewhat indistinctly, upon the soles of some of the infants' shoes a modification of a trade-mark registered and used by Guptill in connection with his business of manufacturing ladies' leather shoes. This trade-mark has never been to any great extent advertised or used by the plaintiffs.

If it can be said, and this is doubtful, that commercially the mark had made an impression upon the trade sufficient to identify it with the product which the plaintiffs have sold, it is many years junior to the defendant's mark. The plaintiffs have acquired no rights at common law, or by statute, against the defendant growing out of their use of the trade-mark in connection with their business, unless they are helped by the earlier registration and use by Guptill in connection with his business. In order to derive any aid from the use which Guptill made of the trade-mark, the plaintiffs are obliged to establish rights as successors not only to the trade-mark but to the business in connection with which the trade-mark was used. It is the plaintiffs' contention that they did succeed to the rights of Guptill and, as such successors, are entitled to relief against the defendant. These asserted rights are based upon a claim that they succeeded to Guptill's business and, furthermore, that they acquired,

by virtue of Guptill's will and mesne assignments, title to the Guptill trade-mark.

The registration of Guptill's trademark did not create substantive rights. It merely gave jurisdiction to the United States court and gave Guptill certain procedural advantages. L. E. Waterman Co. v. Gordon (C. C. A.) 72 F.(2d) 272, 273; United States Ozone Co. v. United States Ozone Co. of America (C. C. A.) 62 F.(2d) 881; Mulhens & Kropff, Inc. v. Ferd Muelhens, Inc. (D. C.) 38 F.(2d) 287; American Trading Co. v. H. E. Heacock Co., 285 U. S. 247, 52 S. Ct. 387, 390, 76 L. Ed. 740.

In this last case Chief Justice Hughes, referring to the protection afforded by the Trade-Mark Act (15 USCA § 81 et seq.), stated:

"* * * the Federal statute did not attempt to create exclusive substantive rights in marks, or to afford a refuge for piracy through registration under the Act, but to provide appropriate procedure and to give the described protection and remedies where property rights existed."

Nor did the registration enlarge Guptill's rights beyond what they would be under common-law principles. United Drug Co. v. Theodore Rectanus Co., 248 U. S. 90, 99, 39 S. Ct. 48, 50, 63 L. Ed. 141; Estate of P. D. Beckwith, Inc., v. Commissioner of Patents, 252 U. S. 538, 543, 40 S. Ct. 414, 64 L. Ed. 705; Ammon & Person v. Narragansett Dairy Co., Ltd. (C. C. A.) 262 F. 880, 881.

The only right which Guptill had, he acquired under common-law principles. This was a qualified right and is regarded as a property right "only in the sense that a man's right to the continued enjoyment of his trade reputation and the good will that flows from it, free from unwarranted interference by others, is a property right, for the protection of which a trademark is an instrumentality." Mr. Justice Pitney in Hanover Milling Co. v. Metcalf, 240 U. S. 403 at page 413, 36 S. Ct. 357, 360, 60 L. Ed. 713.

In United Drug Co. v. Rectanus Co., supra, the court said:

"There is no such thing as property in a trade-mark except as a right appurtenant to an established business or trade in connection with which the mark is employed. The law of trade-marks is but a part of the broader law of unfair competition; the right to a particular mark grows out of its use, not its mere adoption; its function is

simply to designate the goods as the product of a particular trader and to protect his good will against the sale of another's product as his; and it is not the subject of property except in connection with an existing business."

■ This qualified property right is undoubtedly capable of being transferred by will and by assignment, but it cannot be transferred in gross or at large like rights in a patent. United Drug Co. v. Rectanus Co., supra; Ammon & Person v. Narragansett Dairy Co., Ltd., supra; Treager v. Gordon-Allen, Ltd. (C. C. A.) 71 F.(2d) 766; Storm Waterproofing Corp. v. L. Sonneborn Sons, Inc. (D. C.) 31 F.(2d) 992, 993.

■ Such right, however, passes with a transfer of the business to the transferee. President Suspender Co. v. Macwilliam (C. C. A.) 238 F. 159; Replogle v. Air-Way Co., 52 App. D. C. 364, 287 F. 765; United States Ozone Co. v. United States Ozone Co. of America, supra.

■ In the absence of evidence to the contrary, it will be assumed that trade-mark rights pass without formal assignment with the business when the business with which it has been identified has been sold or transferred. United States Ozone Co. v. United States Ozone Co. of America, supra; President Suspender Co. v. Macwilliam, supra.

■ Trade-mark rights pass to trustees in bankruptcy and to the purchaser of the bankrupt's business from the trustee in bankruptcy. United States Ozone Co. v. United States Ozone Co. of America, supra; Woodward et al. v. White Satin Mills Corp. (C. C. A.) 42 F.(2d) 987.

■ The use of the trade-mark cannot be the subject of contract divorced from the business or property to which it was attached. Nisley Shoe Co. v. Nisley Co. (C. C. A.) 72 F.(2d) 118.

■ It follows that the recorded assignment of 1929, purporting to convey Guptill's interest in the registered trade-mark, was wholly ineffectual to pass any rights to the plaintiffs in the absence of evidence establishing succession to Guptill's business.

■ Only one conclusion can be drawn from the facts in this case, and that is that Guptill's business passed out of his hands in 1922 into the hands of Greenman. It was conveyed to him by instrument conveying absolute title. There was no reservation of any trade-mark rights or good will. On the contrary, Guptill acquiesced in the use of these by the transferee of his assets. Whatever may have been Guptill's relation to the business prior to November, 1926, that relationship then terminated. Thereafter it was continued by Greenman or Kennedy with the use of the Guptill name and trademark. The evidence does not support the plaintiffs' contention that they acquired Guptill's business, or any part of it. The real situation is that they appropriated a trade-mark which Greenman had discarded and used it in connection with a business which, while somewhat related to Guptill's business, could not be said to be a continuation of his business inasmuch as he never entered the trade as a manufacturer of anything other than ladies' shoes. It may be that plaintiffs are entirely within their rights in using this abandoned trade-mark. At any rate, for reasons which will hereafter appear I think they stand in no danger of being interfered with by the defendant. If, however, any conflict exists between the two trade-marks, the plaintiffs' rights are subordinated to those of the defendant.

■ But if we were to assume, for the purposes of the case, that the plaintiffs did succeed to the rights of Guptill, it by no means follows that they would be entitled to prevail in this suit. Guptill, by registering his winged foot, acquired no monopoly in the symbol which he adopted. "The owner of a trade-mark may not, like the proprietor of a patented invention, make a negative and merely prohibitive use of it as a monopoly." United Drug Co. v. Rectanus Co., supra.

■ The law of trade-marks is a part of the law of unfair competition. General Baking Co. v. Gorman (C. C. A.) 3 F.(2d) 891; Caigan v. Plibrico, etc., Co. (C. C. A.) 65 F.(2d) 849; Hanover Milling Co. v. Metcalf, supra.

■ When the equity courts interfere with the use of a trade-mark, they act quite as much in the public interest as in the interest of the complainant. General Baking Co. v. Gorman, supra.

■ Where a trade-mark is likely to deceive the purchasing public, the use will be enjoined although the plaintiff may not be seriously in need of protection, but it will not interfere when ordinary precaution by the purchaser of articles would enable him to discriminate the one from the other.

McLean v. Fleming, 96 U. S. 245, 255, 24 L. Ed. 828.

■ If the marks are not deceptively similar and plaintiff has shown no impairment of its good will by its use by defendant, it would be grossly inequitable to enjoin the defendant who, for 25 years, has enjoyed without interruption or molestation the right to use its trade-mark in building up a good will reaching to all quarters of the globe.

Guptill and the defendant were not competitors, nor were their products competing. France Milling Co., Inc. v. Washburn-Crosby Co., Inc. (C. C. A.) 7 F.(2d) 304; Treager v. Gordon-Allen, Ltd., supra. They were not selling their products in the same market. They did not reach the same purchasing public. The defendant sold to shoe manufacturers and to jobbers who sold to cobblers, whereas Guptill sold to the retailer. The trade-marks were so far dissimilar that no purchaser in buying defendant's soles or heels would be led to think for a moment that he was purchasing goods, the origin of which could possibly be attributed to Guptill.

Compare Howe Scale Co. v. Wyckoff, Seamans & Benedict, 198 U. S. 118, 140, 25 S. Ct. 609, 49 L. Ed. 972; Wallingford v. International Mfg. Co., 244 Mass. 477, 138 N. E. 832; New England Confectionery Co. v. C. A. Briggs Co., 256 Mass. 456, 152 N. E. 712; Hutchinson, Pierce & Co. v. Loewy (C. C. A.) 163 F. 42; De Voe Snuff Co. v. Wolff (C. C. A.) 206 F. 420.

Guptill's registered trade-mark showed only a foot with two wings. It was not associated with any name, but from his advertising it appears that he always used it accompanied by the word "Guptill," represented in a distinctive script. It is a fair inference that the trade-name "Guptill" symbolized Guptill's product quite as much as, if not more than, the winged foot. Whenever the winged foot was used, it was surrounded by a sunburst, so that the foot itself never became a predominant feature of the trade-mark. It could not possibly have been mistaken for the defendant's trade-mark, a dominant feature of which was the word "Goodyear" or the word "Wingfoot." The defendant's trade-mark always showed not only the winged foot, which was readily distinguishable from Guptill's symbol, but also the word "Goodyear" or "Wingfoot."

■ The heels and soles manufactured and sold by the defendant, carrying either of its trade-marks, have been so long and so widely advertised that in the mind of the purchasing public such merchandise was bound to be associated only with the defendant's product. The commercial impression of the trade-mark is derived from it as a whole, and not from its elements separated and considered in detail. Estate of P. D. Beckwith, Inc., v. Com'r of Patents, 252 U. S. 538, 40 S. Ct. 414, 64 L. Ed. 705.

■ It will be presumed that purchasers will act with ordinary care to see that they get what they want. Caigan v. Plibrico Jointless Firebrick Co., supra.

■ The test must be whether the similarity of the trade-marks would mislead the ordinary observer. Ward Baking Co. v. Potter-Wrightington, Inc. (C. C. A.) 298 F. 398. And, applying this test to the trade-marks involved in this suit, it would be difficult to imagine any one of ordinary intelligence mistaking the one for the other.

This case is wholly wanting in evidence tending to show bad faith on the part of the defendant in adopting and using its trademark. It is established beyond controversy that it adopted the trade-mark and for years used it in ignorance of the Guptill mark and that it has never used it with any intention of appropriating any part of Guptill's good will or injuring him in any way in his business. There is no evidence that any such injury has resulted. We have not a case where the defendant has adopted a deceptively similar trade-mark, or tradename for the purpose of misleading the public. Consequently, such cases as Hudson Motor Car Co. v. Hudson Tire Co. (D. C.) 21 F.(2d) 453, and Akron-Overland Tire Co. v. Willys-Overland Co. (C. C. A.) 273 F. 674, do not apply. These cases might have some relevancy if the defendant had ever undertaken to incorporate in its trademark or advertising the word "Guptill." There is no claim that it ever did this or any other act designed to invade any field which Guptill may have preempted with his trademark as registered, or as used by him. It is to be noted further that the defendant's trade-mark was registered under a statute which forbade registration of a trade-mark "which so nearly resemble a registered or known trade-mark owned and in use by another and appropriated to merchandise of the same descriptive properties as to be likely to cause confusion or mistake in the mind of the public or to deceive purchasers." 15 USCA § 85.

Defendant's registration was duly published as required by the act. 15 USCA § 86. Guptill recorded no opposition.

There are other considerations that do not serve the equities of the case. It is clearly apparent that, after an attorney acting for the plaintiffs had suggested to the defendant that it might be for its interest to pay plaintiffs for the privilege of using its own registered trade-marks, the Guptill will was probated, over two years after his death, and a written assignment containing untrue recitals was executed, all as parts of a plan to build up a case against the defendant in the hope of exacting tribute from it.

In determining the equities of the case, it is also appropriate to compare the very limited use which the plaintiffs have made of the trade-mark since they adopted it, and their restricted market and output, with the extensive use made by the defendant of its trade-marks in its advertising, the amount expended in building up a good will around the trade-mark, and the success that has attended its efforts to establish a reputation for its product.

I concur in the following from defendant's brief:

"Now, however, to deprive it (defendant) of the use of a mark which it has so widely popularized would not only cause it an enormous loss in trade and in good will but would hopelessly confuse and deceive the buying public which has come to know the mark as designating the product of this defendant."

 In view of the foregoing, it seems hardly necessary to give extended consideration to defendant's defense of laches. In view of all the advertising in trade publications, in the Saturday Evening Post, in street cars in Massachusetts, it is inconceivable that Guptill was not aware of the defendant's use of the trade-marks. Rather, it is much more probable that, being aware, he acquiesced, as he well might have, in such use. Notice will be implied when for a long period of years a product has become identified with the trade-mark it bears. C. B. Fleet Co., Inc., v. Mobile Drug Co. (C. C. A.) 284 F. 813; Window Glass Mach. Co. v. Pittsburgh Plate Glass Co. (C. C. A.) 284 F. 645; French Republic v. Saratoga Vichy Spring Co., 191 U. S. 427, 24 S. Ct. 145, 48 L. Ed. 247.

A delay of 30 years before asserting a claim for infringement, under the circumstances of the instant case, effectively bars plaintiff's right to equitable relief. Old Lexington Club Distillery Co. v. Kentucky Distilleries & Warehouse Co. (D. C.) 234 F. 464, 469; Valvoline Oil Co. v. Havoline Oil Co. (D. C.) 211 F. 189, 194; Simpson v. Newport News Shipbuilding & Dry Dock Co. (D. C.) 18 F.(2d) 318; George J. Meyer Mfg. Co. v. Miller Mfg. Co. (C. C. A.) 24 F.(2d) 505; Westco-Chippewa Pump Co. v. Delaware Elec. & Supply Co. (C. C. A.) 64 F.(2d) 185; Creswill v. Grand Lodge Knights of Pythias of Ga., 225 U. S. 246, 32 S. Ct. 822, 56 L. Ed. 1074; Ancient Egyptian Arabic Order of Nobles of the Mystic Shrine v. Michaux, 279 U. S. 737, 49 S. Ct. 485, 73 L. Ed. 931.

Plaintiffs, by amendment, seek cancellation of that part of the defendant's trade-mark represented by the word "Goodyear." There is no merit in their contention that the word cannot constitute a valid part of a composite trade-mark. Estate of P. D. Beckwith v. Commissioner of Patents, supra.

That the name "Goodyear Rubber Co." is not subject to exclusive appropriation (Goodyear's India Rubber Glove Mfg. Co. v. Goodyear Rubber Co., 128 U. S. 598, 9 S. Ct. 166, 32 L. Ed. 535) is immaterial to any issue in this case.

The plaintiffs having failed to make a case entitling them to relief in these proceedings, a decree dismissing the bill of complaint may be entered.

The parties have filed numerous requests for findings and rulings which, so far as material and consistent with the foregoing, are allowed; otherwise they are denied.