**MERRY HULL & COMPANY, Plaintiff,**

v.

**HI–LINE CO., Inc., Gay Sprites, Inc., Charles H. Sheldon, David I. Tuckerman, Chester Weinreb, Fred Dallmayer and Phyllis Berens, Defendants.**

**MERRY HULL & COMPANY, Plaintiff,**

v.

**MERRY MITES, INC., Defendant.**

United States District Court
S. D. New York.

July 2, 1965.

with infringement of the registered trademarks "Merry Mites", and "Tall Trousers", and with infringement of a patent on the overall "Tall Trousers", unfair competition in the use of the names Gay Sprites and High Pants and in the appropriation of plaintiff's designs and styles, and conspiracy among all defendants to engage in these acts. Plaintiff seeks an injunction as well as an accounting.

Several defenses have been pleaded: the purchase by Merry Mites, Inc. of the corporate and trade name "Merry Mites", abandonment and relinquishment of it by plaintiff, constant use of it by defendant Merry Mites, Inc., with plaintiff's acquiescence, constituting an estoppel against plaintiff, and counterclaims seeking a declaration that plaintiff's trademark registrations and patent are invalid, their cancellation and damages and counsels' fees.[1]

Plaintiff is a partnership composed of Gladys and Robert Geissmann, husband and wife. Mrs. Geissmann was in 1947 a designer of children's clothes, including mittens, under the professional name of Merry Hull. Defendants Merry Mites, Inc. and Gay Sprites, Inc., are New York corporations engaged in the manufacture and sale of boys' and girls' wear respectively, including overalls; four of the individual defendants are officers of both corporations and defendant Berens is an employee.

The essential facts are not in dispute; their legal significance is. In 1947, plaintiff through Gladys Geissmann (Merry Hull) designed a line of infants' and young children's wear called "Merry Mites by Merry Hull" which was received with great enthusiasm by fashion editors and department store representatives and buyers. In order to sell its designs plaintiff leased and began operation of two factories in Pennsylvania to manufacture these garments. To secure capital and finance this enterprise a corporation was formed on February 3, 1948

Brumbaugh, Free, Graves & Donohue, New York City, for plaintiff; John F. Neary, Jr., Richard A. Lochner, Daniel H. Brown, New York City, of counsel.

Watson, Leavenworth, Kelton & Taggart, New York City, for defendants Hi-Line Co., Inc., Charles H. Sheldon, David I. Tuckerman, Chester Weinreb and Phyllis Berens; Leslie D. Taggart, Herbert Blecker, Nicholas John Stathis, Albert Robin, New York City, of counsel.

Irving Seidman, New York City, for defendant Gay Sprites, Inc.

RYAN, Chief Judge.

These two consolidated suits were filed by plaintiff charging all the defendants

---

1. The trial of this suit was interrupted by the death of Judge Noonan; by stipulation of all parties the trial was continued before me on the record made before Judge Noonan.

under the name of Merry Hull, Inc., which acquired all the assets of the plaintiff's Infants' Wear Division, the division which had been set up for the Merry Mites wardrode, excepting the glove division. In need of additional capital after almost a year of manufacturing and selling Merry Hull, Inc., in November, 1948 was merged into a newly formed Ohio corporation, Merry Mites, Inc., which continued the business of its predecessor. Plagued by financial difficulties in the spring of 1950, Merry Mites, Inc. (Ohio) filed a Chapter X proceeding in Ohio and later, on July 14, 1950 was adjudged a bankrupt, and the reorganization trustee became the bankruptcy trustee. By order of a Referee in Bankruptcy, all the assets of the bankrupt were sold to one Rudolph, an auctioneer, and on November 30, 1950 at a public auction in New York defendant Hi-Line purchased from the auctioneer the bankrupt's name Merry Mites, Inc., as well as some of its assets. Defendant Merry Mites, Inc., was organized in New York on December 27, 1950 to take title to these assets and the name; it did so and commenced the manufacture and sale of boyswear under that name in the spring of 1951, which it continued for the next six years and was engaged in at the time this suit was instituted. Defendants' claim of right to the use of the mark "Merry Mites" flows from the purchase by Hi-Line from the auctioneer.

In October, 1950, plaintiff commenced to make a few sales of children's garments and continued to do so sporadically through the next six years. Plaintiff's claim of right to the use of the mark derives from these sales, although it is not disputed that during these years 1950–57 it was not listed in the New York City Telephone Directory, that it made no attempt to sell and did not sell any of the large department stores, that it had no facilities to fill orders, and that its income tax returns during these years showed no gross or net income from the sale of children's garments, or from any business.

The trademark issues raised by these contentions are:

1. Did defendant acquire title through the bankruptcy sale to the trademark "Merry Mites"?

Obviously, if it did then any use by plaintiff was unlawful and plaintiff acquired no rights to the mark.

2. If defendant did not acquire title through the sale, did it acquire title to the mark by its subsequent appropriation and use?

3. The answer to "2" presents for determination the question whether plaintiff's prior use was sufficient to bar defendant's appropriation; and assuming it was does the name Gay Sprites infringe plaintiff's right.

4. Is plaintiff barred in any event from equitable relief by reason of laches?

5. Does plaintiff have valid title to the mark "Tall Trousers" and have defendants infringed on it?

6. If defendant Merry Mites, Inc., is found to be the owner of the mark "Merry Mites" are defendants entitled to recover damages and counsel fees?

Plaintiff makes no claim to the corporate name as a corporate name and does not dispute that the Trustee in Bankruptcy had title to it, and could under the law of Ohio dispose of it by sale to another (Sec. 110, sub. a(2), 11 U.S.C.A.; Title 17, Ohio Revised Code Sec. 1701.05). Under Sec. 110, sub. a(2), the trustee, also had title to the trademark "Merry Mites", if the bankrupt had title to it and this is where plaintiff's first attack on the trustee's title comes into play.

It is plaintiff's contention that under the employment agreement entered into between the bankrupt Merry Mites, Inc. (Ohio) and Mrs. Geissmann upon the cessation of business by the bankrupt, title to the mark reverted to plaintiff. This being so, plaintiff continues, its resumption of the mark in October, 1950 was perfectly lawful and its use thereafter sufficient to bar defendant from any claim of title through subsequent use, and sufficient also to bar defendant

from use of the corporate name as constituting unfair competition.

This very same argument was made by plaintiff (through Mrs. Geissmann) to the Bankruptcy Court at the hearing relating to the sale of all the assets including the name and goodwill of the bankrupt, and rejected by the Referee at that time. It also formed the basis for two petitions brought by the Geissmanns in the Bankruptcy Court to reclaim the trademark which were never prosecuted by plaintiff nor directly acted upon by the Referee, but were necessarily denied by him when he ordered the sale by the trustee of the corporate name and the goodwill of Merry Mites, Inc. (Ohio) and when in a subsequent opinion he held that Mrs. Geissmann was entitled to reclaim the name Merry Hull only from the bankrupt.

Although not binding on this Court, the Referee's decision in a subsequent opinion holding that plaintiff was entitled to the name "Merry Hull" was received in evidence on this trial. I have read this opinion and agree with the Referee on his interpretation of the documents through which plaintiff passed title to the name *"Merry Mites"* to the bankrupt.

There were three documents: the first was a Bill of Sale of February 3, 1948 from plaintiff's Infants' Wear Division to the newly formed corporation Merry Hull, Inc., in exchange for a majority of the stock issued to the plaintiff, transferring:

> "All of the assets, tangible and intangible, of every kind, nature and description, wheresoever situate, which the Infants' Wear Division of Merry Hull & Company now owns or has the right to dispose of.
>
> "TO HAVE AND TO HOLD the same unto Merry Hull Incorporated, its successors and assigns, forever."

These assets consisted among others, of children's clothing bearing the labels "Merry Mites by Merry Hull" which the new corporation took over in order to engage for the next ten months in the manufacture and sale of children's wear under this name.

The second document was the merger agreement of December 15, 1948 between Merry Hull, Inc. and Merry Mites, Inc. (Ohio) under which the latter took over all the assets, property and liabilities of the former. Gladys Geissmann was an officer of both corporations; both Geissmanns were majority stockholders and directors, and they took an active part in the merger.

The third document was an employment agreement of the same date entered into between the new corporation and Gladys Geissmann individually, in which she expressly recognized that Merry Mites, Inc. (Ohio) had acquired from Merry Hull, Inc., all its assets. After providing that all designs created by Gladys Geissmann for Merry Mites were to become and remain the exclusive property of the new corporation, the agreement went on to provide:

> "First Party (Gladys Geissmann) hereby releases forever any claim which she may have to the trade name 'Merry Mites', the winged hand trade mark and all designs now or hereafter owned and/or used by Merry Hull Incorporated, a New York corporation, all of the assets of which including the foregoing trade name, trade mark and designs have been or are to be acquired by Second Party through merger and consolidation but only so long as said trade name, trade mark and designs are used in connection with children's clothing (exclusive of shoes and gloves). In addition, First Party hereby gives to Second Party the right and license to use the trade mark 'Merry Hull' but only so long as said trade mark attributes the design of products manufactured by Second Party to First Party and so long as said products shall in fact be designed by First Party. (See Rider "A")

\* \* \* \* \* \*

RIDER "A"

"Second Party further agrees that upon termination of the employment of the First Party, all rights in and to the name Merry Hull and the use thereof in connection with garments manufactured by Second Party shall revert to First Party and Second Party will not thereafter use said name in connection with merchandise made or sold by it except on written authorization of First Party."

■ Unlike the provision relating to the use of the name "Merry Hull", the employment agreement contained no provision for reversion to plaintiff or to Mrs. Geissmann of the name Merry Mites. Plaintiff's attempt to read into this outright grant merely a license terminable upon the corporation's bankruptcy is just not supported by the clear language of the grant, especially when it is read along with the language employed to merely license the use of the name "Merry Hull".

■ Since the corporation had title to the trademark upon its bankruptcy the trustee was vested with the same, which he could sell, assign and transfer. And this brings us to plaintiff's second point which is that since there was no going business at the time of the sale by the trustee to Rudolph, the auctioneer, to which the mark could attach the transfer, it was legally ineffective to give Rudolph the right to the exclusive use of the mark.

■ Since the purpose of a mark is to protect the goodwill of a business, a right in the mark is created by its adoption and use in connection with that business, and if there is no business there is no goodwill and therefore nothing to protect. This is not to say, however, that goodwill can exist only in connection with an active going business and that at the moment business is suspended the goodwill ceases to exist for if this were so there would be few instances where a mark could be transferred in a bankruptcy sale, and little

need for the Bankruptcy Act to provide for the vesting of title to trademarks in the Trustee (May v. Goodyear Tire & Rubber Co., D.C., 10 F.Supp. 249). Goodwill is an asset of a bankrupt like any other asset, and to hold that upon the bankruptcy of the business, the goodwill vanishes would be to deprive the creditors of the bankrupt of what might be a substantial asset (Hammond v. Brunker, 9 R.P.C. 301; Woodward v. White Satin Mills Corp., 8 Cir., 42 F.2d 987). Of course it does not follow that a trustee could not so deal with a mark as to effect its abandonment or its demise, and thus have nothing to transfer (R. F. C. v. J. G. Menihan Corp., D.C., 28 F.Supp. 920). But, this was not the case here.

■ For the two months following the Chapter X petition, the trustee was authorized to and did continue the business of manufacturing and selling children's garments under the "Merry Mites" label; and following the adjudication he continued to do so from the bankrupt's two factories and its New York office—filling orders and completing unfinished garments for them; although now these operations were in order to liquidate the estate for the creditors rather than to keep the business going. Operations came to an end about one month before the Trustee was authorized by the Referee to accept Rudolph's offer to purchase the entire estate. The trustee's use of the mark kept it alive during this time.

In Rudolph's offer, which the Trustee was directed to accept, it was expressly stated that "it was understood that the trustee will deliver all of the assets of the bankrupt corporation including all rights the trustee may have in the corporate name, free and clear of any and all encumbrances." And it was clear at the hearing before the Referee to approve the acceptance of this offer that Rudolph in purchasing the corporate name was acquiring "the good will and everything else," for which he was paying $80,000. In fact it was at this very hearing that plaintiff through Mrs. Geissmann and counsel unsuccessfully ob-

jected to the sale of the trade name, the designs, patterns, trademark, tags, label, etc. claiming that title to them had reverted to plaintiff.

On October 4, 1950, the Referee directed the trustee to accept the offer of Rudolph and authorized and directed the trustee to deliver

> "all the assets of the bankrupt corporation, including all rights the Trustee may have in the corporate name, free and clear of any and all encumbrances".

The only property of the bankrupt excluded from the sale was cash which the bankrupt had in a bank. The trustee executed and delivered to Rudolph a bill of sale, incorporating the above language, dated December 11, 1950.

The two newspaper notices which Rudolph ran to advertise the auction at which he hoped to dispose of what he had purchased, listed for sale "tradename, trademarks and patterns" of the bankrupt. On or about November 30, 1950, in New York City, he held an auction sale of the bankrupt stock of Merry Mites, Inc., which he had purchased. Defendants Sheldon and Weinreb attended the auction and, in competitive bidding, Sheldon, on behalf of defendant Hi-Line Co., Inc., purchased for $1,900. the name *"Merry Mites" and other assets of the bankrupt,* including patterns, piece goods, swatches, samples, and wire mannequins. In addition to receiving the personal property and merchandise, Hi-Line Co., Inc., received written *assignment of Rudolph's right, title and interest in and to the corporate name "Merry Mites, Inc.".* A large quantity of finished and unfinished garments and furniture and the other assets listed in the Trustee's inventory were disposed of to other buyers. On December 27, 1950, the present defendant Merry Mites, Inc., was formed. The bill of sale from Hi-Line Co., Inc., to defendant dated March 29, 1951, transferred all its interest in the corporate name as well as all the chattels it had purchased from Rudolph —these as we have seen included samples, patterns, piece goods, swatches and wire mannequins. Between December 27, 1950 and March, 1951, defendant Merry Mites, Inc. set up manufacturing facilities to produce children's garments. In the spring of 1951, it began marketing children's garments, using its corporate name "Merry Mites, Inc." in connection with the manufacture and sale of children's garments in intrastate and interstate commerce. Since 1951, it has marketed its children's garments under the name "Merry Mites, Inc." and has sold them in the better stores throughout the country, and has widely advertised them under this name with commercial success. The patterns and samples purchased from Rudolph and Hi-Line Co., Inc., have been used by defendant as primary samples for the manufacture of the garments although they had to be altered and reworked for commercial use. It is undisputed, and in fact forms part of plaintiff's claim for unfair competition, that the garments produced by defendant are substantially the same style as those formerly produced by the bankrupt.

So much for the use and intent of the parties,—we now consider the last question, whether as a matter of law the goodwill of the business passed with the corporate name so as to constitute it a legally protected trademark.

Because Hi-Line Co., Inc., did not purchase all or substantially all the assets of the estate as listed in the Trustee's inventory, plaintiff argues that it did not acquire the goodwill of the bankrupt. But it is not the volume that is the test—at least in this type of purchase where the sale is not that of a reorganized going business, rather one in liquidation (cf. American Dirigold Corp. v. Dirigold Metals Corp., 6 Cir., 125 F.2d 446; United States Ozone Co. v. United States Ozone Co., 7 Cir., 62 F.2d 881; S. F. Myers Co. v. Tuttle, 2 Cir., 183 F. 235). Rather the test is whether the assets which are purchased with the name are sufficient to enable the purchaser to "go on in real continuity with its past" (Mutual Life Ins. Co. v. Menin, 2 Cir., 115 F.2d 975). The importance of these

assets to the continuity of the bankrupt's business as a manufacturer of children's distinctive garments, is obvious. As a matter of everyday business sense, patterns and samples of a garment claimed to be so distinctive as to be entitled to patent protection would seem to be necessary to the manufacture of the garments (R. F. C. v. J. G. Menihan Corp., supra). They were the unique feature of the business, as evidenced not only by their transfer to the Merry Mites, Inc. (Ohio) on the merger, but by the employment of Mrs. Geissmann as designer and her release of all claim to the name "Merry Mites", and to the designs—which were to become and remain the property of the corporation. Plaintiff recognized this, when after its unsuccessful attempts to obtain an assignment of the name first from the Trustee in Bankruptcy and then from Rudolph, it attempted to obtain these designs and patterns from defendant Hi-Line Co., Inc., in order to go into the business under the "Merry Mites" label.

We conclude that defendant obtained good title to the mark through Hi-Line's purchase at the bankruptcy sale, that it began to exploit it as soon as practicable, and that as a consequence any attempted use by plaintiff was unlawful, and assuming it sufficient, incapable of establishing it as the owner of the mark.

Even, if we were to hold that defendant did not acquire title to the trademark through Hi-Line's purchase at the bankruptcy sale, it does not follow that plaintiff's attempted appropriation and use in October, 1950 was sufficient to prevent defendant's subsequent use.

Plaintiff's argument seems to be that although defendant acquired title to the corporate name, in the interval of several months which elapsed before it went into business using the name "Merry Mites", plaintiff had put the mark to such use as to establish it as the owner of the mark vested with the right to bar defendant's use of it as a trademark as well as a corporate name.

On the alleged date of first use, October 2, 1950, the bankruptcy proceeding of Merry Mites, Inc. was still pending. Plaintiff knew that the trustee had been authorized to sell to Rudolph the rights which the trustee had to the name "Merry Mites, Inc." and had opposed the sale. Prior to this, on September 8, 1950, plaintiff had filed a petition which asked the Court to order that the trustee assign to plaintiff the trustee's interest in the trade name "Merry Mites". This petition was still pending on October 2, 1950. After the Bankruptcy Court had approved the sale by the trustee to Rudolph, plaintiff filed an amended petition on October 31, 1950, which also prayed, among other things, that the Court order the trustee to assign to plaintiff the trustee's interest in the trade name "Merry Mites". On December 11, 1950, in compliance with the Court order, the trustee assigned his interest in the said trade name to Samuel C. Rudolph, and plaintiff not only knew that the mark had been sold to Hi-Line but attempted to buy it, or obtain it from Hi-Line. At least three of the "sales" of plaintiff's took place at a time when it was actively attempting to obtain the mark from another. Under the circumstances, irrespective of its volume, such a use could hardly serve to clothe the user with a legal right, which a court of equity should protect.

Plaintiff's transitory and minimal use was clearly not sufficient to give it any priority over defendant's long continued and notorious use. (Heublein v. Adams, 1 Cir., 125 F. 782). From 1950 to 1957, plaintiff was not engaged in the business of manufacturing children's garments. As we have seen it had no telephone listing; it did no advertising; it had no factory or reportable income from sales, and it never attempted to nor did it sell any department stores. Its "sales" consisted only of nominal or token sales to relatives and personal friends of the Geissmann's and their employees. In short, it was not operating such a bona fide commercial operation as would entitle it to claim ownership of the mark it used (Van Camp Sea Food Co. v. Univer-

sal Trading Corp., 138 USPQ 323; Nuckols v. Vick Chemical Co., 120 USPQ 95; O'Connor & Gordon, Inc. v. Handicraft Publications, 206 Misc. 1087, 136 N.Y.S. 2d 558).

We find that plaintiff's use throughout was not for the purpose of protecting its right to the mark & investment, but rather an attempt on its part to lay a basis for its action to prevent defendant's future use of the mark. Plaintiff's brief use had not been bona fide, the fact that it was not public and notorious and that it watched in silence while defendant developed the mark would estop it from attempting to appropriate the mark and reap the harvest of defendant's industry and investment (Chandon Champagne Corp. v. San Marino Wine Corp., 335 F.2d 531, C.A. 2, 1964; John Walker & Sons, Limited v. American Tobacco Co., 110 USPQ 249).

We conclude that defendant became the owner of the mark "Merry Mites" by purchase from the Trustee in Bankruptcy; and that its title to the mark was confirmed by long continued and public use. Plaintiff had no legal right to register the trademark, and defendants are entitled to a declaration that Registration No. 563,832 is void, and that the Commissioner of Patents be directed to cancel it (Sec. 1119, 15 U.S. C.A.).

Defendant Merry Mites, Inc., is further entitled to an injunction restraining plaintiff from using the name "Merry Mites", singly or in any combination on children's clothing; such use, when applied to these articles is likely to cause confusion, mistake or deception.

Plaintiff has also charged trademark infringement by defendant Merry Mites, Inc., of its registered Trademark No. 614,461 on "Tall Trousers". Defendant has counterclaimed for a declaration of invalidity of this registration on the ground of false statements made in the application relating to the extent of plaintiff's commercial use and on the further ground that the mark is merely descriptive of the goods to which it is applied and not the proper subject for a trademark.

The evidence of defendant's use of the name "Tall Trousers" was negligible; there was but one instance, in 1955 or 1956 when it appears that the name was used in a pamphlet of limited circulation not distributed to its customers describing the wardrobe of defendant. Defendant makes no claim to any public or extended use of this name. It in fact has disavowed any real use in the past and makes no claim of right to use it in the future. There is consequently nothing to enjoin. While it may very well be that plaintiff's commercial use of the name "Tall Trousers" was not so great as that claimed in the Patent Office, in the absence of any greater use by defendant, defendant is not entitled to have it cancelled. There is not sufficient evidence in the record to make any findings with respect to the validity or invalidity of this mark by reason of its alleged descriptive nature. The claim of unfair competition by reason of defendant's use of "High Pants" to describe overalls was not supported by any evidence of likelihood of confusion, and assuming validity for the mark "Tall Trousers" there was no unfair competition.

Our determination on defendant's title to the mark Merry Mites disposes of plaintiff's claim of infringement and unfair competition against defendant *Gay Sprites* and all the individual defendants in the use of that name, and against defendant Berens as the designer of the Merry Mites wardrobe.

Defendant Berens has been employed by defendant Merry Mites, Inc., since 1955, and plaintiff has offered no proof to show that she does not have a fair claim to hold herself out as a designer.

We come now to the claim that both defendants' overalls infringe plaintiff's patent No. 2,654,093 on the "Tall Trousers" overalls, and the defenses of invalidity through prior use, lack of invention and failure of the patent examiner to consider the prior art.

 Under Sec. 102(b), 35 U.S.C.A., if plaintiff's Tall Trousers were "in public use or on sale" before February 26, 1948, (i. e. more than one year prior to the date of the application), no patent could thereafter issue to protect the claimed invention.

There was evidence to show that Mrs. Geissmann's son Jon wore "Tall Trousers" overalls during 1947; that they were modelled by him and other boys at showings in the fall of 1947, that they were commercially photographed, that they were shown among other items in the Merry Mites wardrobe to representatives of large department stores throughout the country; that plaintiff offered to sell these stores the line and took orders from B. Altman and other stores during November and December, 1947; that the overalls along with the other items of the wardrobe were the subject of widespread publicity in the early part of March, 1948 in Life and other magazines and newspapers. There was also proof that in the summer and fall of 1947, plaintiff had leased two factories to manufacture the Merry Mites wardrobe—the basic garment of which were the Tall Trousers and that most of the garments presented at their showings were manufactured by these factories.

By the end of 1947 plaintiff had placed orders for labels with the mark "Merry Mites, by Merry Hull", and had an inventory on hand of about $30,000 consisting of work in process, finished goods, zippers, and had available machines and operators capable of producing the garments. All of this plaintiff on February 4, 1948 used as an inducement to attract capital investment in its business.

It was further shown that in February, 1947—a full year before—Mrs. Geissmann had written to patent counsel enclosing sketches of the Tall Trousers overalls, pointing out the features which she "had incorporated in Jon Christopher's clothes"; these features were "a built-up back", "built-up waistline", and "adjustable waistline straps". In the letter Mrs. Geissmann asked counsel to proceed to determine the patent possibilities.

The evidence further shows that plaintiff received three checks in February, 1948 from the Neiman, Marcus Co. in payment of Merry Mites garments sold to it by plaintiff, and that on March 1, 1948 Neiman, Marcus advertised these overalls with drawings as on sale in its store in Texas.

Despite this evidence plaintiff argues that the use contemplated by the statute is a commercial use, which it says was not the case here, and that "on sale" means capacity to fill orders received— apparently full capacity—of which it was not capable.

 Plaintiff's argument on the use of Tall Trousers by "Jon" is that since the principal feature of the patented trousers was that they could be adjusted to be worn by a growing child through a period of two years, Jon's wearing of them was experimental rather than commercial because constant changes had to be made by Mrs. Geissmann on the overalls to accommodate them to the boy's growth. Assuming these changes were necessary and were made, the overalls embodying the patented features were complete at least by the middle of 1947 and the boy's use in November and December was one under service conditions to see how well the overalls filled their function rather than experimental (Aerovox Corp. v. Polymet Mfg. Corp., 2 Cir., 67 F.2d 860). In any event the modeling of the overalls by Jon at the showings was not experimental but commercial to display their advantages and promote their sale. (Ronson Art Metal Works v. Brown & Bigelow, Inc., D.C., 104 F.Supp. 716; Dittgen v. Racine Paper Goods Co., 7 Cir., 181 F. 394). These showings also constituted a placing "on sale" of the garments, for the evidence was that the customary way to sell in the garment industry is by sample, i. e. by displaying to buyers the line available and inviting orders—which is just what plaintiff did —(Wende v. Horine, 7 Cir., 225 F. 501).

The fact that plaintiff may not have had inventory made up ready for delivery is not the test, but rather that it had the existing completed product embodying the alleged invention on display in the market—as a sample. Plaintiff had two factories fully equipped to produce the stock and fill orders placed. The fact that because of financial or other problems it was unable to keep up with all orders booked is of no importance.

The evidence shows that plaintiff's activities progressed beyond the statutory requirement of "on sale" and that it actually sold and shipped these overalls, to Neiman, Marcus Co. and J. Garfinckel & Company, before February 26, 1948.

The actual records concerning the manufacture and sale of children's clothing, including the overalls which were covered by the patent in suit, first by plaintiff, then by Merry Hull, Inc. and later by a successor which went bankrupt, were not produced at the trial. Mrs. Geissmann as the purchaser of these from the Trustee in Bankruptcy is the last person known to have had title to these records.

We conclude that the overalls later covered by the patent in suit were in public use, on sale, sold and shipped by plaintiff or by Merry Hull, Inc., more than one year before the patent was applied for; the patent on them is invalid.

We find in addition that the patent is invalid because the Tall Trousers, while unquestionably a well-designed garment lacked that originality necessary to set it apart as an invention. The subject matter of the patent was merely an aggregation of elements known to the prior art, some of which, although not all had already been combined, which affected the appearance of the garment rather than its function as a whole, or the function of any one of the elements.

Thus, the principal invention claimed was the "grow feature" or "grow formula." This was achieved through the following four elements: a high bib; a straight edge above the waistline on each side of the garment which extends around in a straight line to the back; adjustable tabs on each side at the waistline below the upper edge, and adjustable shoulder straps. The leg covering portions could be connected together with a slide fastener extending from the lower end of one leg to the crotch and down to the lower end of the other leg. In addition, the claim defined the garment made of two identical flat pieces of material connected together by front and rear seams—also an important feature.

The only prior art cited by the Examiner showed a two-piece garment with a high bib; of the several prior patents cited by defendant two showed horizontal back and sides; a third showed, in addition to the horizontal back and sides, a front bib, and adjustable straps and side tabs, and still another showed connection of the leg portions by a slide fastener. The publications in evidence showed a variety of overalls containing one or more of these features in the market before plaintiff's patent application was filed.

Although admittedly none of these prior patents show overalls having the slender tall look of Tall Trousers (which was the effect Mrs. Geissmann achieved) it was the uncontradicted testimony that raising or lowering the back and shoulder straps to achieve this look would be a matter of choice to any skilled designer or anyone skilled in the art. In fact, one of plaintiff's witnesses, called as an expert, testified that "any moron even a child" could have thought of moving the upper edge of the bib of the overall as high or as low as the armpit.

The originality claimed by the patent was not a change in the combined functioning of the elements to accomodate the growth of the child—but a change in the appearance of the patented garment when these known elements were put to their expected use; it was also a combination of these features or elements which was within the reach and ability of one skilled in the art.

We conclude that defendants are entitled to judgment on their counterclaim declaring patent No. 2,654,093 invalid,

**56**

because its subject matter was not an invention (Bussemer v. Artwire Creations, D.C., 231 F.Supp. 798; Gross v. J.F.D. Mfg. Co., 314 F.2d 196, C.A. 2, 1963).

Both defendants have counterclaimed for damages alleged to have been sustained by reason of plaintiff's fraudulent trademark registration and for reasonable attorneys' fees incurred in the defense of these actions and the prosecution of the counterclaims.

The only determination to be made now is whether as a matter of law defendants are entitled to recover such damages and counsel fees. Proof as to such damage, if any, and the amount of counsel fees have been reserved for a later hearing.

█ Under Sec. 1120, 15 U.S.C.A., defendants are entitled to recover damages sustained in consequence of plaintiff's false registration. Such damages would include but not be limited to counsel fees incurred in defending the suits brought by plaintiff, and prosecution of the counterclaims seeking declarations of invalidity and cancellation of the trademark (Academy Award Products v. Bulova Watch Co., D.C., 129 F.Supp. 780, affirmed, 2 Cir., 233 F.2d 449).

In the application filed by plaintiff it was claimed that it first used the mark on October 15, 1950, and that, by the date of the application, the mark had been used upon "infants' and children's coats, hats, vests, rompers, sweaters, booties, slippers, overalls, jumpers, trousers, robes, scarves and mittens"; it also stated that it believed it was the owner of the mark and that to the best of its knowledge and belief no other person had the right to use such mark. The evidence we have seen of course shows that this last statement was without support in fact, that plaintiff through Mrs. Geissmann, who swore to these statements, was well aware of the trustee's, Rudolph's and Hi-Line's claim to the name, since she had personally and on behalf of plaintiff opposed them. Mrs. Geissmann's explanation for the making of these statements was that

her attorney had prepared the application, but not only was he her agent, but she had personal knowledge of the facts when she signed and swore to the truth of the application, and of course she bound plaintiff to these statements. Plaintiff's statement was also untrue in that at the time the application was filed the mark had not been used on seven of the items listed, and this too Mrs. Geissmann must have known since at that point the sales made by plaintiff were through her, from her home, had numbered five only, and had been to close relatives or old friends on an informal and personal rather than a commercial basis.

The registered trademark which issued on this application gave plaintiff colorable title upon which to predicate this suit; without it, there would have been no plausible ground to claim title to the mark since its use alone in the face of defendant's recognized use was clearly insufficient to give it any color of ownership. Had the true facts been disclosed to the patent office in the application, no registration could have issued.

When we consider plaintiff's knowledge of the false statements, and couple it with its knowledge that defendant was relying in good faith on its right to use its corporate and trade name in developing its business, and that plaintiff remained silent and inactive throughout these six years, until defendant's operations had become successful, the conclusion is compelling that these suits were filed by plaintiff to harass all the defendants and harm them in their business. And, particularly is this so as to the Gay Sprites' defendants as to whom absolutely no evidence was presented by plaintiff connecting them with the trademark infringement, unfair competition or any conspiracy to commit these acts.

The fees and expenses necessarily expended in defending these claims are recoverable damages sustained in consequence of the registration.

█ The counterclaims seeking declarations of invalidity and cancellation of

the trademark "Merry Mites" were part of this defense and necessary to give defendants full relief from plaintiff's claims. So long as plaintiff remained the owner of this it was in a position to harass defendants and injure them in its business. For this reason attorneys' fees and expenses reasonably incurred in the prosecution of the counterclaims are a direct consequence of the false registration and recoverable under the statute. (Academy Award Products v. Bulova Watch Co., supra; Bascom Launder Corp. v. Telecoin, Corp., 2 Cir., 204 F.2d 331; Landstrom v. Thorpe, 8 Cir., 189 F.2d 46, 26 A.L.R.2d 1170; In re Williams, D.C., 158 F.Supp. 279; Burnett v. Lambino, D.C., 206 F.Supp. 517; Simmonds Aerocessories, Ltd. v. Elastic Stop Nut Corporation of America, D.C., 158 F. Supp. 277).

Assuming that additional fees and expense were incurred in defending the patent from the trademark aspect of the case could be separated, we would permit recovery of those under Sec. 285 of Title 35. Not only was the patent sued on invalid for lack of invention, but we have seen that it was invalid by reason of a prior use (of which plaintiff was informed, of which it should have known) which precluded the granting of a valid patent. The subject matter embodied in the patent was the principal selling or marketing appeal of the new wardrobe designed for plaintiff and prior to the patent had been exploited to its fullest to promote its commercial success. Direct evidence of the extent of plaintiff's sales of the Tall Trousers was rendered impossible by Mrs. Geissmann's destruction of business records. In addition, plaintiff waited three and one-half years to file suit on its patent against Merry Mites and almost eight years as to Gay Sprites, while of course the defendants, the alleged infringers, were building up their business. This casts substantial doubt on whether plaintiff ever had a bona fide belief in the validity of its patent.

We conclude that defendants are entitled to recover from plaintiff all damages sustained by reason of the fraudulent trademark registration, and reasonable counsel fees and expenses incurred in the defense of these actions and the prosecution of the counterclaims, as to both the trademark and patent claims (Rohr Aircraft Corp. v. Rubber Teck, Inc., 9 Cir., 266 F.2d 613; Park-In Theatres v. Perkins, 9 Cir., 190 F.2d 137; Sensytrol Corp. v. RCA, D.C., 190 F.Supp. 121; Shingle Product Patents v. Gleason, 9 Cir., 211 F.2d 437).

A judgment is to be submitted on ten days' notice in accordance with this decision, and providing for further trial to determine recoverable damages, counsel fees, and expenses.